**Robert G. McCRAY, Petitioner,**

v.

**L. B. SULLIVAN, as Commissioner, of the Alabama State Board of Corrections et al., Respondents (two cases).**

**Jerry WHITE and Alvin Claybrone, Petitioners,**

v.

**COMMISSIONER OF ALABAMA BOARD OF CORRECTION and Warden D. M. Van Cleve, Respondents.**

**Civ. A. Nos. 5620–70–H, 6091–70–H and 7094–72–H.**

United States District Court, S. D. Alabama, S. D.

Aug. 7, 1975.

Robert G. McCray, pro se and William R. Lauten, Mobile, Ala., (Court-appointed), for petitioners.

Larry Newman, Asst. Atty. Gen., Montgomery, Ala., and Robert G. Kendall, Mobile, Ala., for respondents.

Jerry White, Alvin Claybrone, pro se.

**WILLIAM BREVARD HAND, District Judge.**

The above-styled cases, tried to the Court on the respective petitions filed in each, were appealed to the Court of Appeals where they were consolidated for disposition. On March 19, 1975, the Court of Appeals rendered its opinion affirming in part, reversing and remanding in part (*McCray v. Sullivan*, 509 F.2d 1332).

## I. MAIL CENSORSHIP

The original petition by Jerry White and Alvin Claybrone against the Commissioner of the Alabama Board of Corrections dealt generally with the conditions in the penitentiary as it involved punitive isolation, deprivation of the basic elements of hygiene, access to the Courts, censorship of the mails and the

like. The matter was remanded to the Trial Court for consideration of the mail issue in light of the decisions of the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed. 2d 935, and in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224. Since the Trial Court's original opinion involving the mail matters was entered, the prison mail policy was further amended so that mail is no longer censored or interfered with and this Court is of the opinion that the defendant is in compliance with the present policies of the Supreme Court. See Court's Exhibit 1.

## II. PUNITIVE ISOLATION

■ The second point to which the Court of Appeals addressed itself was the potential violation of the 8th Amendment in regard to punitive isolation at the Fountain Correctional Institution, formerly known as the Atmore Prison Farm, and Holman Prison. Since the original trial of this issue and the rendering of the opinion by the Appellate Court, the prison officials have closed the isolation cells and are in the process of renovating them so as to provide two bunk beds, a toilet and a lavatory. Until this has been accomplished, inmates placed in isolation are now housed in the segregation units which have these accommodations. The Assistant Commissioner, a former warden, testified that the prison does not ordinarily assign more than two prisoners to an isolation cell and does not propose to do so in the future except in cases of unusual circumstances where it might be necessary to assign more, but even in this event they do not anticipate placing more than three inmates in any cell and should that occur a third inmate will be furnished a mattress. The prior decision of this Court in *Beard* limited the number that could be placed in these 6 x 8 ft. cells to seven. The testimony reflects that the assignment of this number occurred on only one occasion and that was following a prison riot. In any, event, the prison officials are content

that the *Beard* and *Lake* injunctions be amended to provide that under ordinary circumstances no more than two will be assigned to any isolation cell except in cases of emergency where others might have to be housed in this facility, and then in that event, they will attempt to limit the number to not more than three. The Court finds that this is not unreasonable and it is so ordered.

■ The Court of Appeals questioned the restrictions by the institutions placed on inmates in isolation relative to prohibiting access to the Courts by denying them the availability to writ paper, etc. while in isolation. This question has been the subject of litigation in the Middle District in Case No. 3817–N, styled *Jerry White v. L. B. Sullivan, et al.,* which was an action in the nature of a class action and in which an order was entered requiring that writ paper, etc., not be denied prisoners in isolation so that they might have access to the courts. The Court feels that this is dispositive of the issue; however, without strong opposition from the defendants, it is ORDERED that henceforth the prison officials will not deny to prisoners in punitive isolation writ paper, etc. for their use in petitioning the courts, and shall in no way or manner interfere with or restrict these prisoners from petitioning the court or communicating with their attorneys as they so desire.

## III. INSTITUTIONAL SECURITY

In the *McCray v. Sullivan* petitions, the Appellate Court remanded the cause to the District Court for consideration of the claim by McCray that homosexuals frequently are the cause of violent assaults causing injury or death and that such occurrences are condoned by prison authorities. The District Court had refused to receive testimony on the point under the provisions of *Young v. Wainwright,* 5 Cir., 449 F.2d 338. Following remand, testimony was taken on this point.

Plaintiff McCray has, since this testimony was taken, moved the Court to

allow his action to proceed as a class action. The Court finds that a class action is appropriate and that plaintiff's motion is due to be granted. An appropriate order will be entered at the conclusion of this Opinion and Order.

The testimony reflects that consenting and non-consenting homosexuality is a very real problem in all prisons in all States—not just limited to the Fountain-Holman Complex or other Alabama prisons. Assistant Commissioner Capps testified that even though there are approximately only twenty-five known homosexuals in the Holman-Fountain Complex, at one time or another approximately fifty percent of the prison population engages in homosexual conduct. The twenty-five known homosexuals create no particular problem for the prisons because they are of a very passive nature. The evidence does indicate, however, that violence sometimes occurs, and has occurred on more than one occasion, when aggressive type homosexuals get into a fight over the passive type. The Court is reluctant to give much credence to the testimony offered by the prisoners themselves because they refused to give names, dates and specifics and therein deprived the prison officials of their ability to rebut or contradict the statements made. The overall thrust of the evidence does establish, however, that homosexual activity on the part of inmates has on several occasions resulted in serious injury or death to inmates.

Violence in the prisons is not confined to that emanating from homosexual conduct and the Court is convinced that homosexual violence is exaggerated in terms of both frequency and degree in comparison with other forms of inmate violence.

The prison authorities policy toward inmate violence in all its forms is to discourage by providing supervision and surveillance with custodial staff, to afford protective custody to those inmates who fear for their safety at the hands of fellow inmates, and to punish or prosecute to the extent possible those found quilty of acting violently toward others. In addition, those inmates who are identified as known homosexuals or prone to violence are segregated from the general population.

The evidence clearly shows that the defendants and other prison officials have in good faith endeavored to combat the violence in Alabama prisons, but that they are handicapped in the implementation of their policies due to severely overcrowded institutions and a dire shortage of custodial personnel.

Commissioner Sullivan testified that as of July 28, 1975, the four major male institutions were housing 1486 more prisoners than they were designed to accommodate.

Specifically, the situation was as follows:

| Institution | Design Capacity | Actual Population |
|---|---|---|
| G. K. Fountain Corr. Center | 632 | 1132 |
| Draper Corr. Center | 632 | 1088 |
| Holman Unit | 508 | 831 |
| Medical & Diagnostic Center | 440 | 647 |
| Totals | 2212 | 3698 |

The number of custodial staff at these four institutions would still be insufficient even if the institutions were at or below their respective design capacities. Commissioner Sullivan testified that there are certain posts or stations which must be manned at each institution, regardless of the number of inmates housed, to provide reasonable institutional security. The following table graphically demonstrates the problem in this area.

| Institution | Custodial Staff at Present | Staff needed to man all posts |
|---|---|---|
| Fountain | 117 | 178 |
| Draper | 98 | 184 |
| Holman | 74 | 159 |
| Medical & Diagnostic Center | 94 | 171 |
| Totals | 383 | 692 |

Thus, the defendant and the other prison authorities are in the hapless position of being forced to attempt to control the inmate population in four institutions housing 67% more prisoners than

they were designed to house with a staff that is 309 people short of the number necessary to provide reasonably adequate security under "normal" or "uncrowded" conditions.

The result is that on any given shift a single guard has the responsibility of overseeing and controlling approximately two hundred inmates. As expressed by the Assistant Commissioner, there are not enough guards available day or night, to provide only one guard for dormitories housing upwards of two hundred prisoners.

Prisoners offered testimony that the guards tend to condone homosexuality and fighting by failing to break up observed acts. The Court finds that rather than condoning such acts, the scarcity of guards simply serves to permit these acts to occur unobserved by correctional officers. For instance, one lone guard doing a bed check on several dormitories could hardly control or supervise the activities of several hundred inmates who might be inclined to violence.

When such severe overcrowding is coupled with staffing levels grossly below that necessary for providing reasonable security under normal population levels at the design capacity of these institutions, it is obvious that lives and safety of the guards and inmates are in constant danger. While overcrowded conditions undoubtedly increase the tensions inherent in a prison atmosphere, the Court eschews any notion that such overcrowding causes, in a legal sense, violence to occur between the prisoners. Overcrowding does mean, however, that those prisoners with a bent toward violence and criminality can engage in their heinous conduct with a greater degree of freedom from detection, especially when one considers the insufficient numbers of prison "police" available. Overcrowding also means that the policy of the prison authorities to segregate those inmates identified as homosexuals or as being a source of danger is frustrated simply by not having sufficient space available to do the job. Overcrowding also adversely thwarts the policy of the prison to separate first offenders from the hardened criminals. Lastly, the overcrowded conditions coupled with insufficient staff creates the ever present danger of inmates taking over an institution or making a wholesale escape. Indeed, it is a credit to Commissioner Sullivan and other prison officials that something like this has not already occurred.

This Court has long adhered to and has faith in the proposition that Federal courts should be reluctant to interfere with the internal operation and administration of state prisons, *Granville v. Hurt,* 411 F.2d 9 (5th Cir., 1969); but, that this Court has the duty to do so when Constitutional rights of inmates are being clearly violated is not open to question. The 8th Amendment to the Constitution prohibits cruel and unusual punishment. (The philosophy is that the punishment should fit the crime and anything over and above that is considered cruel and unusual.) Prison officials are much better trained, educated and experienced in prison management than are the Courts and they should be given wide latitude in the operation of their prisons, to classify inmates, and to determine appropriate measures to maintain a modicum of peace and quiet within. When, however, prison officials are given insufficient facilities and personnel to house and govern too many prisoners, the lives of the prisoners can become less than human and their treatment less than humane. While confinement in a prison does suspend certain rights available to nonprisoners, it does not suspend the humanity of the imprisoned. *Gates v. Collier,* 501 F.2d 1291 (5th Cir., 1974). This Court finds that the State of Alabama has violated the Constitutional rights of the plaintiff class by confining them in overcrowded and understaffed prisons where their lives and safety are constantly in danger and that corrective measures are demanded.

Several observations are pertinent at this point. The Court is mindful that violence and homosexuality would be prevalent in Alabama prisons under even the most ideal conditions because of the very nature of the persons confined within. Although Assistant Commissioner Capps was frank to admit that homosexual violence could never be stamped out, he did testify that a significant improvement in that area could be made if the prisons had more help and more space. In short, unnecessary and excess violence will, in all probability, continue to occur until some relief is afforded. As it appears at this writing, nothing by way of correction has been nor does it seem to be forthcoming from the Alabama Legislature at whose doorstep relief from the conditions in question lie.

The maintenance of law and order is essentially a state function. This Court has no quarrel with that nor does the Constitution of the United States. Indeed, the exercise of the police power by the State is one of the rudimentary functions of government. The creation and maintenance of penal institutions squarely fall within these legitimate exercises of government. The Federal Courts have no ordinary involvement except in extreme cases when the State abandons its obligation under the Constitution, which obligation they assumed when they agreed to become members of the Union. Indeed, this Court has consistently refused to interfere with the administrative operations of the prisons for as stated this Court recognizes that the expertise lies with those who face the problems on a day to day basis. Neglect or inattention to this ever increasing problem by the State Legislature, for whatever its reason, has allowed a legitimate function of its government to so deteriorate that Constitutional requirements are not being met and the rights of basic humanity are being violated.

It is distressing to see that the Alabama judicial system is carrying the brunt of the public complaint about the breakdown in law and order. This is particularly so when past history demonstrates that it has been the Legislature that has refused to provide adequate facilities to house those who violate the law and must be incarcerated, and to provide the means for segregating or discriminating between and among the more violent criminal, the recidivist, and those most likely to cause repeat performances by new inmates confined under present conditions, but that is the condition that actually exists. This Court therefore cannot abandon its Constitutional obligations and is compelled to consider appropriate relief to effectuate these obligations.

This Court neither desires to nor does it look forward to undertaking to impose upon the State of Alabama its solutions to the problem created by the present state of the Alabama Penal System, for this Court feels that that is squarely the burden and obligation of the State Legislature to solve, and solve it it must. Overcrowding and inadequate staffing appear to be the largest immediate problems and the only solution so far offered to this Court is the building of more institutions or adding to existing ones, providing more emphasis on work-release, study-release, or half-way houses, making provisions for alternatives to incarceration and increasing custodial personnel. This Court is prepared to fulfill its obligations under the law by entering appropriate Orders based on the information presently available to it; however, this Court feels before this be done, inasmuch as the Legislature is now in session, that it, the Legislature, should be given an opportunity to undertake appropriate remedial action that would render any judicial interference moot.

Pending the hoped for resolution of the issue by that body during this term, this Court will delay the entry of its Order in regard to the remaining issues under consideration, and shall, forthwith, seek, and hopefully obtain, additional information that will enable the Court to fully explore all available ave-

nues for the resolutions of the problems in the event the Legislature fails to meet its legitimate obligation. To this end, it is ordered that further hearing on this case be scheduled for Friday, August 29, 1975 at Mobile, Alabama at 9:00 a. m. at which time the Court shall elicit from the Pardon and Parole Board, the State Board of Education and the Alabama National Guard, evidence wherein these departments can assist or possibly assist in providing relief for the over-crowding and the housing of present inmates. The parties are hereby notified of the scheduled hearing.

It is further ordered that the Clerk shall forthwith issue subpoenas on behalf of the Court to the several members of the Pardon and Parole Board, the State Superintendent of Education and to the Commanding General of the Alabama National Guard directing that they be and appear before the Court for the above scheduled hearing for the purpose, insofar as the Pardon and Parole Board is concerned of giving testimony as to its methods of operation, its considerations, if any, to the present prison conditions, and recommendations, if any, as to how it might contribute to the alleviation of the problem; insofar as the State Board of Education is concerned, information that it might have as to available facilities formerly required in the educational process in the State that might be utilized to house prisoners; and insofar as the Alabama National Guard is concerned what equipment it may be in a position to make available to the prison system on a temporary basis, such as tents, etc. that might constitute temporary housing and what other facilities under their command might be utilized on an immediate basis for relieving the problem under consideration.

It is further ordered that henceforth this case shall proceed as a class, the petitioner representing himself and all members of a class composed of all male inmates or prisoners confined to or who could reasonably be expected to be confined to any prison or institution within the penal system operation by the State of Alabama, other than juvenile facilities.