**Nazareth GATES et al.,**
**Plaintiffs,**

v.

**John COLLIER et al., Defendants.**

**No. GC 71-6-K.**

United States District Court,
N. D. Mississippi,
Greenville Division.

Oct. 31, 1975.

Roy S. Haber, Boulder, Colo., Paul S. Lawrence, Dept. Justice, Washington, D. C., David M. Lipman, Jackson, Miss., for plaintiffs.

P. Roger Googe, Jr., Asst. Atty. Gen., Jackson, Miss., for defendants.

## MEMORANDUM ORDER

KEADY, Chief Judge.

This suit began as a multifaceted constitutional attack on conditions of confinement at the Mississippi State Penitentiary (familiarly known as Parchman) by a plaintiff class of penitentiary inmates. The United States subsequently entered the case as plaintiff-intervenor. In October 1972, we issued our initial findings and decree [1] specifying and enjoining a variety of unconstitutional practices and conditions and have since followed with numerous implementing rulings on various aspects of Parchman's operation.

On December 13, 1974, the private plaintiffs, dissatisfied with the pace of improvements at the prison, moved for further relief, alleging that the defendant prison officials had failed to comply with our earlier orders in several material respects. In January 1975, a three-day evidentiary hearing was held on plaintiffs' motion and the entire Parchman situation thoroughly reexamined. From comprehensive evidence presented at that hearing, the court found that "substantial progress has been made toward removing or eliminating, if not in whole then certainly in great part, many of the nefarious practices and conditions which this court found to exist in 1972." [2] Indeed, the remarkable progress made in virtually every area of our earlier constitutional concerns left only two significant problems whose resolution had either not already occurred or was not assured.

These remaining problem areas were, first, that Parchman officials had not yet provided inmates with constitutionally acceptable medical services. Needed were a new hospital facility and two additional doctors, one a psychiatrist and the other a chief medical officer. Secondly, the court found that, as in 1972,

"many if not most of the aged housing units continue to remain, in appalling, deplorable condition unfit for human habitation." 390 F.Supp. at 489. Overcrowding of inmates was also found to contribute to the acute housing problem. To remedy these conditions, defendants were ordered to "establish a time-table for and proceed to implement (a) adequate medical facilities and services, and (b) the reduction of overcrowding of prison inmates at residential camps as well as the elimination of those residential camps unfit for human habitation." 390 F.Supp at 490.

After submission of remedial plans by the defendants, we conducted an evidentiary hearing on the constitutional sufficiency of the proposals. At this hearing in August 1975, defendants submitted detailed architectural plans for the construction of a $3.5 million medical-dental facility which the court found would fully meet constitutional requirements. Construction is contingent upon legislative appropriations being granted at the 1976 session of the state legislature, which will convene in two months. Defendants also reported progress in securing additional medical personnel, having employed a full-time psychiatrist for treatment of the prison population. Despite extensive efforts, defendants had not secured the services of a chief medical officer, but reported that alternate arrangements had been made with a number of nearby private physicians, who had agreed to provide inmate medical treatment. The court accepted this solution as temporarily satisfactory until another full-time physician could be employed.

With respect to Parchman's housing problem, defendants submitted uncontradicted data revealing that although the present inmate population numbered 2260, only 2094 inmates could be housed in existing housing units without unconstitutional overcrowding. The court de-

1. *Gates v. Collier*, 349 F.Supp. 881 (N.D. Miss.1972), aff'd 501 F.2d 1291 (5 Cir. 1974).

2. *Gates v. Collier*, 390 F.Supp. 482, 484 (N. D.Miss.1975).

termined that the failure to provide a minimum of fifty square feet of barracks living space per inmate would result in such overcrowding. The evidence established that new construction now underway would, within the next year, add housing space for 631 additional inmates under sanitary, constitutional conditions; new housing units already completed and occupied provide 300 inmates with modern living conditions. Further, since our original 1972 decree, important renovative work had been performed on some of the older residential camps; general sanitation and sewerage had also measurably improved. These efforts had ameliorated, but did not finally resolve, the constitutional deficiencies in inmate housing.

To remedy overcrowding of inmates as well as to deal with the more serious problem of dilapidated housing, the court proceeded to order the closing of six old residential camps on a specified timetable between July 1, 1976, and July 1, 1977.[3] Concomitantly, the court placed a ceiling on the number of inmates who could be housed at each of the remaining residential camps after January 1, 1977. This ceiling had the effect of guaranteeing constitutionally adequate living space to each inmate and for practical purposes placed an embargo, effective January 1, 1977, on housing more that 2237[4] inmates at Parchman in facilities now extant or under construction.

■ Now plaintiffs again move for further relief, requesting the court to accelerate the timing of the scheduled housing relief. In sum, plaintiffs seek an immediate injunction enjoining the defendants from accepting any additional prisoners into Parchman until every inmate has been provided with at least fifty square feet of barracks living space. The Department of Justice, in a departure from previous positions taken in this court, joins in the request for the foregoing relief. Plaintiffs' motion is solely based on two recent district court decisions which plaintiffs urge are here applicable. For reasons that follow, we disagree.

In *McCray v. Sullivan*, 399 F.Supp. 271 (M.D. and S.D.Ala.1975), District Judges Brevard Hand and Frank Johnson reviewed housing conditions in the Alabama penal system and enjoined the state from receiving at its prisons additional inmates until the prison population was reduced to levels compatible with constitutional standards. The court found that the affected institutions in Alabama had been designed to house 2212 inmates, yet the actual prison population at the date of the court's order was 3698—or an overcrowding of approximately 67%. Coupled with this critical overcrowding and exacerbating the situation was a serious shortage of custodial staff. The court found that although 692 correctional officers were needed to maintain reasonably adequate security even in uncrowded conditions, only 383 officers—or 55% of a minimal staff—were in fact employed. The district courts of Alabama were also confronted with shocking evidence of virtually uncontrolled violent assaults by prisoners, which posed constant danger to very inmate and guard in the system.

Plaintiffs also rely on the Louisiana remedy prescribed in *Williams v. Mc-Keithen*, No. 71–98 (D.La. Sept. 5, 1975). There, District Judge Gordon West found that the Louisiana penitentiary at Angola had been designed to accommodate no more than 2641 prisoners. In June 1975, 3983 prisoners were either incarcerated at the institution or enroute there. Thus, overcrowding had already attained a critical level of 49%

---

3. The court's Order of August 7, 1975, is included as an appendix to this opinion.

4. Based on constitutional capacities of all existing housing units not closed by court order on January 1, 1977, plus all additional housing space already under construction and scheduled for completion before the effective date of the housing ceiling. *Absent further construction, the inmate capacity of existing units will decrease to 2027 on July 1, 1977, as a result of the ordered closing of Camps 8 and 9 on that date.*

more than capacity. Judge West also noted that the monthly increment at Angola was averaging 64 prisoners with little hope of amelioration. The prison warden conceded that it was often necessary to place two to eight prisoners in a cell designed for single occupancy. It was further found that custodial staff at Angola was seriously inadequate, and there was habitual physical violence among the inmates, which was at least partially attributable to the gross overcrowding and inadequate correctional staff. Judge West's response was to enjoin acceptance of new prisoners at Angola, excepting returning escapees and parole violators, until the prison population was reduced to manageable levels.

The critical overcrowded conditions in the Alabama and Louisiana prisons had obviously reached proportions which can only be described as barbaric, and which carried daily threats to the physical safety of large numbers of the prison population. Under the conditions found in *McCray* and *Williams,* where nearly all semblance of order and inmate protection had disappeared, and where there were no indications that the states involved were prepared to move forward to eliminate the problems, this court can readily appreciate that the drastic step of an immediate embargo on further inmate population increases would be both appropriate and necessary.

Here, however, the circumstances are substantially different. The facilities currently in use at Parchman have a designed prison capacity of 2094. As of September 23, 1975, the most recent period for which we have accurate population figures, approximately 2290 inmates were being housed in these facilities—an overcrowding of 10%. Further, this court knows the Parchman correctional staff to be disciplined and well-trained, and, although perhaps somewhat understaffed, is far better equipped to deal with inmate problems than appears to have been the case in ei-

ther Alabama or Louisiana.[5] Violence among penitentiary inmates at Parchman, while once prevalent, has now been dramatically reduced. Present conditions at Parchman, while still constitutionally unsatisfactory in several respects, are a far cry from what existed in 1972 and from what evidently obtain in our two neighboring states.

Parchman is distinguishable from the Alabama and Louisiana cases in one further respect: here, the chief problem with inmate housing, as we have already noted, is not with the overcrowding of residential camps and accompanying violence, but with the dilapidated condition of many housing units. Though the Mississippi penitentiary is overcrowded, it is not yet critically or alarmingly so, and certainly not to any degree which poses imminent physical danger to large numbers of inmates and staff. Therefore, the drastic expedient adopted in *McCray* and *Williams* to deal with an emergency situation is inappropriate here. Indeed, we have already taken what we deem to be constitutionally adequate action in our August 7 order mandating the closing of no less than six of the oldest facilities and placing practical limits on the prison population.

That order, as we have seen, contains a rigid timetable with which the defendants *must* comply. Indeed, as noted, our earlier order contains its own measured embargo, which will take effect, inexorably, on January 1, 1977. In light of the history of the Parchman case since 1972, and in view of the substantial progress already made by state officials acting in good faith to bring the penitentiary to constitutional law, we cannot say that a more radical remedy would be proper at this time.

Constitutional treatment of human beings confined to penal institutions, of course, is not dependent upon the willingness or the financial ability of the state to provide decent penitentiaries. Most emphatically, the constitu-

---

5. See 390 F.Supp. at 485.

tional rights of inmates at Parchman must be honored by Mississippi if the State is to operate that institution as a penitentiary. See *Finney v. Arkansas Board of Correction*, 505 F.2d 194 (8 Cir. 1974); *Wyatt v. Aderhold*, 503 F.2d 1305 (5 Cir. 1974); *Holt v. Sarver*, 309 F.Supp. 362 (E.D.Ark.1970), aff'd 442 F.2d 304 (8 Cir. 1971). Nevertheless, in achieving constitutional compliance no court is bound to invoke draconian measures, particularly when another course, less drastic and already initiated, seems more likely to produce satisfactory results. This court has heretofore established deadlines which will guarantee the inmates at Parchman constitutionally adequate housing. Prison officials know what must be done to achieve compliance; they also know the inevitable effect of noncompliance. Nothing presented by the plaintiff inmates or the Department of Justice convinces us that our earlier rulings were inadequate and erroneous, or that we need to embark on a course adopted by other courts in situations far more egregious than that facing us. Accordingly, it is

Ordered

That plaintiffs' motion for further emergency relief is denied.

### APPENDIX

### ORDER

Pursuant to this court's prior order of February 3, 1975, the defendants have submitted plans for the construction of a new prison hospital and have reported their efforts to employ two additional full-time prison doctors, including a chief medical officer and a psychiatrist. Also, defendants have submitted comprehensive plans for the reduction of the prison inmate population and the elimination of residential camps determined to be unfit for human habitation, together with an analysis of present maximum capacity for inmate housing based upon generally recognized correctional criteria providing not less than 50 square feet per inmate. Private plaintiffs have responded, making objections to the adequacy and propriety of certain aspects of defendants' submissions. After notice, an evidentiary hearing was scheduled as to the sufficiency of defendants' submissions, whereupon all parties appeared in court personally and by their attorneys and after the introduction of oral and documentary evidence, and the court having delivered from the bench findings of fact and conclusions of law based upon the total evidence in the cause and in conformity with its prior rulings in this case, as reflected more fully in the court reporter's notes; it is

Ordered

1. The plans submitted by defendants for the construction of a new medical-dental prison facility with provision for 52 beds, auxiliary areas, and out-patient facilities, this structure to contain approximately 48,836 square feet and to cost $3,500,000, be approved as constitutionally adequate and satisfactory in all respects; and the steps taken by the defendants, under 1975-granted legislative authority for pre-planning contracts with an architectural firm satisfy defendants' obligation for hospital planning. Construction of the new facility is conditioned upon legislative appropriations being granted during the 1976 session of the Legislature, in which case it would be possible to commence the project during the fall months of 1976, with 24 months allowed for completion. Legislative implementation of defendants' medical-dental facility plan will enable the State to remove a glaring constitutional deficiency which remains at the Mississippi State Penitentiary. With respect to defendants' efforts to comply with the court's order for the employment of two additional full-time doctors, including a chief medical officer and a psychiatrist, the court finds that the defendants have employed a full-time psychiatrist and, though unable to employ a second medical officer, have made every reasonable effort to obtain one and are diligently continuing attempts to secure an additional full-time prison doctor. Until a second full-time prison

physician is secured, defendants shall make alternate arrangements with physicians practicing near the Parchman facility, at Clarksdale, Ruleville, Drew, Cleveland and Shelby, to treat prison inmates, and such alternate arrangements shall, temporarily, constitute substantial compliance with this court's prior order respecting additional medical personnel. Provided, however, that defendants shall within 10 days submit to the court a report disclosing the names and locations of all such alternate physicians and specifying the nature and extent of medical assistance to be provided by each. Any change in such alternate medical assistance shall be promptly reported to the court.

2. Submissions by defendants which analyze the capacity of the existing housing facilities in accordance with recognized correctional criteria to provide not less than 50 square feet per inmate, identify those residential camps which are not feasibly repairable, are unfit for human habitation and hence should be abandoned, and propose an order of priority for elimination have been considered, together with objections thereto raised by private plaintiffs and plaintiff-intervenor. After due consideration of the evidence offered at this and prior hearings, the court finds that the total capacity of the prison's 23 existing housing units (including the new women's camp) constitutionally permits the housing of 2094 inmates, but the present prison population approximates 2260. Based upon present usage, 12 residential camps are overcrowded and fail to provide inmates with constitutionally required minimum space. The court reaffirms that constitutional standards require not only the elimination of certain old residential camps incapable of adequate repair and renovation and long unfit for human habitation but also the elimination of overcrowding of inmates at other facilities which either presently exist, or are under construction, or planned for early construction. Because of constitutional imperatives, the court deems it necessary at this time to order the closing of certain camps determined to be unfit for use in accordance with a specified time table and to set definite standards for housing the inmate population; it is, therefore, ordered as follows:

(a) Not later than July 1, 1976, defendants shall abandon and close Camp B and Camp 4. The closing of these two housing units, which are determined to be most deplorable and in the worst condition, will eliminate space for 233 inmates.

(b) Not later than January 1, 1977, defendants shall abandon and close Camp 10 and Camp 11. These two camps, found to be in the second most deplorable condition, will eliminate space for 183 inmates.

(c) Not later than July 1, 1977, defendants shall abandon and close Camp 8 and Camp 9. These two camps, also found to be unfit for human habitation, will eliminate space for 210 inmates.

The elimination of the foregoing six camps, ordered to be phased out within the next 22 months in accordance with the above time schedule, will reduce total inmate capacity by 626. During that period of time, however, the evidence reflects that space for housing 631 additional inmates will become available as follows: a new women's camp, 72 beds, shall be completed within six weeks from this date; two 162-man medium security temporary housing units presently under construction and to be completed by April 1, 1976, will have a capacity of 324; a 192-man medium security facility presently under construction and to be completed July 1, 1976, with a capacity of 192; and renovation of the old women's camp for a reception center and an addition, to be completed July 1, 1976, with an increased capacity of 43.

The court reserves the question of ordering the closing of other old housing units which may remain unfit for human habitation.

3. To assure that inmates hereafter housed at the Mississippi State Peniten-

tiary shall be afforded space in accordance with constitutionally determined standards, defendants shall, not later than January 1, 1977, fully satisfy such constitutional requirements by housing inmates at each residential camp not in excess of the following limits:

| | | |
|---|---|---|
| Camp 1 | 139 | |
| Camp 1 | 103 | |
| Camp 3 | 55 | |
| Camp 4 (closed as of July 1, 1976) | | |
| Camp 5 | 127 | |
| Camp 6 | 120 | |
| Camp 7 | 100 | |
| Camp 8 | 134 | (to be closed 7–1–77) |
| Camp 9 | 76 | (to be closed 7–1–77) |
| Camp 10a | 100 | |
| Camp 10b (old Camp 10) | | (closed as of 1–1–77) |
| Camp 11 | | (closed as of 1–1–77) |
| Camp 12 | 100 | |
| Camp 20 | 100 | |
| Front Camp | 40 | |
| Women's Camp (when renovated and expanded) | 156 | |
| Women's Pre-release | 8 | |
| Dairy Camp | 21 | |
| Hospital | 50 | |
| Camp B (closed as of July 1, 1976) | | |
| MSU | 52 | |
| First Offenders' Camp | 168 | |
| New Women's Camp | 72 | |
| New Temporary housing units, 2 | 324 | |
| New medium security facility | 192 | |

———◆———

Any housing facilities in addition to those enumerated above constructed prior to January 1, 1977, may be utilized on the basis of providing space at the rate of 50 square feet per inmate.

By virtue of the foregoing paragraphs, the court places a ceiling upon the number of inmates to be housed at each of the penitentiary housing units in use from and after January 1, 1977. Defendants shall thereafter be prohibited from accepting prisoners for whom the penitentiary is unable to provide minimum housing space in constitutionally adequate facilities.

Defendants shall submit to the court within 30 days after the dates scheduled for closing of camps on July 1, 1976, January 1, 1977, and July 1, 1977, a report on each camp closing, the disposition of the inmates at the closed camps, and a summary of the population at the remaining units.

The clerk of court is hereby directed to send, by United States mail, postage prepaid, a certified copy of this order to Honorable William L. Waller, Governor of the State of Mississippi; Honorable A. F. Summer, Attorney General of the State of Mississippi; Jack K. Reed, Superintendent of Mississippi State Penitentiary; the chairman and members of the Mississippi State Penitentiary Board; and all counsel of record in the case.

This, 7th day of August, 1975.

    (s) <u>William C. Keady</u>
        Chief Judge
        United States District Court