**William JOHNSON, Jr., Plaintiff,**

**v.**

**Dan V. McKASKLE, Interim Director, Texas Department of Corrections, et al., Defendants.**

**No. H–81–454–CA.**

United States District Court, S.D. Texas, Houston Division.

July 26, 1984.

supplied to the Court. Hence, the Court has had

Larry R. Daves, Tyler, Tex., for plaintiff.

to rely on the parties' briefs and affidavits.

Iris J. Jones, Asst. Atty. Gen., Austin, Tex., for defendants.

## MEMORANDUM OPINION

JUSTICE, Chief Judge.

### I. PROCEDURAL BACKGROUND

In conformance with the decision of the Court of Appeals in the above-entitled civil action, 727 F.2d 498 (5th Cir.1984), this, the "*Ruiz* court",[1] *id.,* at 501, is required to examine the record in each 42 U.S.C. § 1983 action filed by Texas Department of Corrections ("TDC") inmates which involves TDC defendants, so as to determine whether an individual plaintiff asserts "legal or equitable claims directly related to or dependent upon rights adjudicated and incorporated in the *Ruiz* injunctive decree." *Ibid.* The Court of Appeals further explained the purpose of such an examination by stating: "Only by requiring that such prisoner claims for constitutional deprivation be filtered through the *Ruiz* court, can courts ensure a minimal, consistent degree of federal intervention in the affairs of the TDC, even-handed, effective relief for TDC inmates, and the orderly administration of an injunctive decree by the court that authored and is administering it." *Ibid.*

To comply with this mandate, this court has initiated a review process designed to evaluate the "*Ruiz*-relatedness" of well over a thousand pending TDC inmate § 1983 actions. The preliminary review is the essential first step in identifying and classifying those § 1983 actions which, through the nature of the claims pleaded, in some way indicate violations of the *Ruiz* injunctive decree. Once so identified, these cases will require further action on the part of this, the "*Ruiz* court", in order to ensure that any adjudication of the claims raised is achieved in a manner consistent with the provisions of the decree.

The Court of Appeals identified three alternate classifications into which this court may find a particular § 1983 action

falls: (1) that the claims raised are within the scope of the *Ruiz* injunctive decree but do not violate it; (2) that the claims are contrary to the decree; or (3) that the claims are not covered by the decree. Depending upon the classification found to be appropriate, this court may further choose one of the following methods of disposing of the individual prisoner's claims:

> (a) retain and adjudicate the equitable rights asserted..., (b) retain and adjudicate the legal rights asserted, if they are based on the terms of the injunctive decree and should be decided as part of any claims for equitable relief that the court adjudicates, (c) issue a show cause order for criminal or civil contempt and, if appropriate, impose punishment or award compensatory damages or other civil relief, or (d) return the action to the court from which it was transferred if it [is] determine[d] that the [*Ruiz*] decree is not implicated and an independent adjudication in the separate § 1983 action is more appropriate.

*Ibid.* The Court of Appeals indicated that these four described methods of disposition are not intended to be exhaustive; other options may be exercised where an unusual case so requires.

### II. CASE HISTORY

The plaintiff in the instant action, William Johnson, Jr., filed his original complaint in the Southern District of Texas on February 26, 1981. Claiming Eighth Amendment violations and other unconstitutional deprivations at the hands of TDC officials, plaintiff sought declaratory and injunctive relief, as well as damages, under the provisions of 42 U.S.C. § 1983. In his complaint, plaintiff named ten TDC employees as defendants, disclosed his status as a wheelchair-bound paraplegic, and related several incidents involving himself and TDC officials, alleged to have occurred primarily during late 1980 and early 1981.

---

**1.** *Ruiz v. Estelle,* 503 F.Supp. 1265 (S.D.Tex. 1980), *aff'd in part and vacated in part,* 679 F.2d 1115 (5th Cir.), *amended in part,* 688 F.2d 266

(5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983).

In the first of these incidents, plaintiff complained of a disciplinary hearing held on March 21, 1980, where he was charged with refusal to obey an officer's order to cut his hair. Plaintiff stated that, at the time of the order, his hair was properly cut, and no TDC rule existed as to the appropriate length of an inmate's hair. Plaintiff further claimed that his request to present witnesses in his behalf during the disciplinary hearing was denied, that he was found guilty of the violation by the Unit Disciplinary Committee, and that he was subsequently punished by cancellation of his trusty status and by demotion in line class.

The second incident of which plaintiff complained was alleged to have occurred on October 22, 1980. Plaintiff related that TDC Corrections Officer Johnson became angry at plaintiff for playing his radio, although plaintiff was wearing earphones, and arranged for plaintiff's immediate transfer to segregated "lock-up" status when plaintiff refused to turn off the radio. Defendant Johnson was also alleged to have taken plaintiff's wheelchair (along with other personal property), leaving plaintiff without any means of mobility. Plaintiff's segregated cell apparently being too small to accommodate the wheelchair, it was stored in the hallway in front of the cell, allegedly beyond his reach or use. In consequence, plaintiff asserted, crawling on the floor was his only mode of movement, and he was completely unable to reach either the sink to get drinking water or the toilet to relieve himself. Plaintiff stated that he was confined in this segregated status continuously until November 7, 1980. During this two week period, plaintiff charged, he was not taken before a disciplinary committee, notwithstanding his administrative appeals for release.

The third incident of which plaintiff complained occurred some five days after his release from segregation. On November 12, 1980, plaintiff alleged, he was brought before the Unit Disciplinary Committee, and charged with five violations: possession of a weapon, refusal to obey orders, failure to obey an order, disrespectful attitude, and lying to an officer. Plaintiff maintained that he had been given no advance violation notice, had no knowledge of any pending charges, and was not given a copy of any officer's report. Plaintiff allegedly was found guilty, with a punishment imposed of forfeiture of 365 days of "good time" and fifteen days in solitary confinement.

Plaintiff's fourth area of complaint related to the frustrations he allegedly experienced in attempting to use TDC's grievance procedures to rectify his situation. Plaintiff charged that on December 21, 1980, having received little or no response to his previous formal administrative appeals, he again wrote Director Estelle seeking an investigation and a return of his personal property (taken on October 23, 1980, when plaintiff was placed in segregation). Plaintiff declared that he received no response from Director Estelle, other than a letter stating that the Director's time for answering would be extended.

The fifth incident plaintiff narrated also involved allegedly unfair disciplinary proceedings. Plaintiff asserted that on December 30, 1980, he was taken to the Hospital Administrator's office and informed that a disciplinary charge was pending against him. Plaintiff contended that he had no knowledge of the nature of the charge, and further recounted that he wrote Director Estelle, the Unit Warden, and even this court, in his efforts to "not be punished for an infraction he had not committed in the first place." These alleged efforts, apparently, were without success; plaintiff stated that on January 5, 1980, he was again taken before the Unit Disciplinary Committee, there to be charged with failure to obey an order, and again punished by having an additional 120 days of "good time" taken and radio privileges removed for sixty days.

Next, plaintiff described his January 22, 1981, enrollment in an art class, taught on a different floor from his cellblock. Plaintiff affirmed that, being wheelchair-bound, and thus unable to negotiate stairs, his

only access to the art class was by elevator. Plaintiff also alleged that on January 25, 1981, the elevator became inoperative; and on the same date, plaintiff and several other handicapped participants in the same cellblock were dropped from enrollment by the art teacher, for their failure to attend class. Plaintiff stated that he and the other affected inmates immediately filed an "I–127" administrative request, asking that they not be dropped from the art class. Plaintiff argued that he continued to operate under the assumption that he had, in fact, been so dropped, and thus did not attend the January 28, 1981, art class. He recited that this absence led the art teacher to issue a violation notice against him, for "failure to obey an order". Plaintiff further stated that this disciplinary charge was still pending at the time of the writing of his complaint, even though there was then no written TDC rule defining failure to attend an art class as a disciplinary violation. Plaintiff asserted that he did attend the art class on January 30, 1981, but the instructor informed plaintiff that he had been dropped from enrollment.

Plaintiff also complained of a seventh incident, occurring on January 30, 1981. Plaintiff stated that, on that date, defendant Corrections Officer Reyna, observing the presence of two exercise weights on plaintiff's cellblock, issued a violation notice to plaintiff for the possession of contraband. Defendant Reyna is alleged to have issued this notice with knowledge (having been so informed by plaintiff and several other handicapped inmates on the cellblock) that the weights had been present on the cellblock for over two years, and were kept there so as to permit the handicapped inmates, who were not allowed outdoors recreation, a mode of exercise.

After detailing these factual allegations, plaintiff set forth some eight "causes of action", propounding somewhat duplicative claims of violations of his Fifth, Eighth, and Fourteenth Amendment rights. For relief, plaintiff's original complaint sought a declaratory judgment holding the defendants' actions, policies, and practices unconstitutional, and injunctive relief which would require the defendants to: (a) permit plaintiff to call witnesses in his own behalf during disciplinary hearings; (b) cease their practice of housing plaintiff in such manner as not to afford him access to his wheelchair; (c) provide plaintiff with a copy of any offense report before a disciplinary hearing; (d) allow plaintiff to remain on his present cellblock with other paraplegic inmates; and (e) not retaliate against plaintiff in any manner for his pursuit of legal remedies. Plaintiff also demanded actual damages against every defendant of $10,-000, along with a demand for an additional $10,000 in punitive damages against each.

Plaintiff's action, after joinder of issue, proceeded to consideration before a United States Magistrate, who, in granting a motion to dismiss made by defendants, ruled that plaintiff's equitable claims were barred by the doctrine of *res judicata.* The Magistrate reasoned that those claims had been previously litigated in the *Ruiz* class action, *supra,* and that plaintiff, as a member of the *Ruiz* class of all TDC prisoners, was precluded from relitigating the equitable issues his complaint raised.

The district court adopted the Magistrate's recommendation of dismissal, a holding which was ultimately reversed on appeal by the Court of Appeals for the Fifth Circuit. *Johnson, supra,* 727 F.2d at 500. The Court of Appeals, in reversing the district court's ruling that *res judicata* barred plaintiff's action, noted that the claims of plaintiff "necessarily could not have been litigated as a part of *Ruiz* since they occurred after the completion of that trial." *Id.* This observation is accompanied by the following footnote: "The acts allegedly committed against Johnson occurred in 1980 and 1981. The *Ruiz* trial ended on September 20, 1979." *Ibid.* Employing this reasoning, and reaching the principal holding discussed in Section I, *supra,* the Court of Appeals vacated the district court's order of dismissal, and remanded with directions that plaintiff's claims be transferred to this, the *"Ruiz* court". The Honorable Norman W. Black,

United States District Judge for the Southern District of Texas, the presiding judge, entered an order to this effect on May 25, 1984.

## III. PROCEDURAL RESOLUTION

### A. *Issue Presented*

The Court of Appeals' holding in this case affects many more litigants than those directly involved in the instant action; and the adjudication of Johnson's individual claims, by itself, leaves untouched the hundreds of other TDC inmate § 1983 actions which must be addressed by this, the *"Ruiz* court", in order to fulfill the Court of Appeals' mandate.

Johnson's claims, are presented in a procedural posture which will obviously recur in the overall review process undertaken by this court. As was noted in the Court of Appeals' opinion, Johnson's claims succeed in time the *Ruiz* trial's termination, which was on September 20, 1979. Some of Johnson's claims also antedate the May 1, 1981, entry of the court's *Amended Decree Granting Equitable Relief and Declaratory Judgment* in the *Ruiz* litigation, and, as well, pre-date the Court of Appeals' treatment of that decree. (*See* June 23, 1982, opinion, affirming in part and vacating in part, this court's order, at 679 F.2d 1115; *see also* the September 16, 1982, *per curiam* opinion on rehearing, amending in part the Court of Appeals' previous order, at 688 F.2d 266.) Given the fact that this court's injunctive order, the *Amended Decree*, cannot be said to have been operative prior to its May 1, 1981 entry, the defendants in Johnson's action, or, for that matter, the defendants in any other TDC inmate § 1983 action which raises claims antedating that order, cannot be considered to have then been in anywise enjoined by this court's decree. Notwithstanding this procedural circumstance, the instant action squarely poses an issue certain of repetition in future *"Johnson* -mandated" reviews: the degree to which the legal and equitable rulings made in the *Ruiz* case are to have retroactive application. Otherwise stated, this court must initially consider which law is to be applied to current and future TDC inmates' § 1983 actions; that is, whether the apposite law is that extant at the time the events underlying the plaintiff's claim are alleged to have transpired, or whether the appropriate precepts are those expressed in the *Ruiz* decree.

### B. *Nonretroactivity Analysis*

The issue of nonretroactivity has arisen most frequently in the area of criminal prosecutions, particularly where new constitutional doctrine has been decided and its potential application to cases pending on appeal is at issue. The Supreme Court addressed this problem most recently in the case of *Solem v. Stumes,* —— U.S. ——, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984), and there noted: "[A]s a rule, judicial decisions apply 'retroactively.' Indeed, a legal system based on precedent has a built-in presumption of retroactivity. Nonetheless, retroactive application is not compelled, constitutionally or otherwise." *Stumes, supra,* at ——, 104 S.Ct. 1341, 79 L.Ed.2d 579 (citations omitted). Where retroactive application of a decision is determined to be inappropriate, any such exception must be based on "the interest of justice" and "the exigencies of the situation." *Id.*

In the civil sphere, the Supreme Court's decision in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971), set forth a three-pronged balancing test to deal with the question of whether a judicial decision should receive nonretroactive (*i.e.,* prospective) application only:

First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retroactive operation will further or retard its operation." Finally, we

have weighed the inequity imposed by retroactive application, for "[w]here a decision of this court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." *Id.* (Citations omitted.) Applying this analysis, the Supreme Court held that a Louisiana one-year statute of limitation (otherwise made applicable to the respondent's case because of an intervening Supreme Court decision) should not be applied retroactively to bar the plaintiff's suit, inasmuch as the plaintiff could not have foreseen the superseding change in legal doctrine.

The Court of Appeals for the Fifth Circuit has also had recent cause for considering whether a judicial decision should be given prospective application only. In a diversity case, *McLaughlin v. Herman and Herman,* 729 F.2d 331 (5th Cir.1984), the Court of Appeals addressed the argument that a district court had erred in giving retroactive application to a Louisiana decision, which characterized legal malpractice as sounding in tort rather than contract (a one year statute of limitations applying to the former, and a ten years statute to the latter. In applying a Louisiana Supreme Court case—which itself essentially followed the United States Supreme Court's *Chevron* analysis, *supra* —the Court of Appeals found that the district court was correct in ruling that the retroactive application of the one year statute of limitations was proper. *Id.*

■ Whether any aspect of the *Ruiz* case should receive nonretroactive, or prospective, application, is thus an issue to be resolved in light of the Supreme Court's *Chevron* analysis. The first factor to be considered under that inquiry is whether *Ruiz* established a "new principle of law", such that clear past precedent was overruled; or if contrawise, whether an issue of

first impression, not otherwise foreshadowed, was decided.

While this court's *Amended Decree* in *Ruiz,* even as modified on appeal, undeniably addresses a broad spectrum of issues relating to the constitutionality of conditions of inmate confinement in TDC institutions, there is very little in the decision which may be said to have made novel law, or to have established new precedent. For instance, in the area of overcrowding, several cases, in this and other circuits, had previously found unconstitutional violations in prison systems by reason of overcrowded conditions. *See, e.g., Williams v. Edwards,* 547 F.2d 1206 (5th Cir.1977); *Gates v. Collier,* 501 F.2d 1291 (5th Cir.1974); *Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala., 1976), *aff'd sub nom. Newman v. Alabama,* 559 F.2d 283 (5th Cir.1977); *McCray v. Sullivan,* 399 F.Supp. 271 (S.D.Ala. 1975); *Battle v. Anderson,* 564 F.2d 388 (10th Cir.1977); *Chapman v. Rhodes,* 434 F.Supp. 1007 (S.D.Ohio 1977), *aff'd* 624 F.2d 1099 (6th Cir.1980); *Ramos v. Lamm,* 485 F.Supp. 122 (D.Colo.1979); *Capps v. Atiyeh,* 495 F.Supp. 802 (D.Oregon 1980).[2]

Similarly, in the field of adequate health care, the contours of a state's constitutional obligations to its inmate population had already been well-established by case law, before the entry of the *Ruiz Amended Decree. See, e.g., Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hurst v. Phelps,* 579 F.2d 940 (5th Cir. 1978); *Fielder v. Bosshard,* 590 F.2d 105 (5th Cir.1979); *West v. Keve,* 571 F.2d 158 (3rd Cir.1978).

As yet another example, the judicial recognition of the constitutional right of uninhibited inmate access to courts, counsel, and public officials, also significantly predated the entry of the *Ruiz Amended Decree. See, e.g., Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Cruz v. Hauck,* 475 F.2d 475 (5th Cir.1973).

**2.** These citations, as do others subsequently incorporated in this opinion, reflect the state of the case law at the relevant time in question,

that is, when the *Ruiz* injunctive decree was entered.

It appears, therefore, that in almost all provinces of prison confinement addressed by the *Ruiz* injunctive decree, the legal doctrines upon which it was based had already been formulated, and applied by the courts, for a substantial length of time. Little reason exists, therefore, to consider the first of the *Chevron* factors as necessitating only prospective application of the strictures imposed on TDC by the *Ruiz* decree.

As to the second *Chevron* factor, that of "weigh[ing] the merits and demerits in each case", to determine if retroactive application of the rule in question would further or retard the rule's operation, there is, again, little reason why the general rule of retroactivity should not be followed. The defendants in the *Ruiz* litigation, primarily officers of the Texas Department of Corrections, had operated under constitutional constraints in the management of the Texas prison system long before the *Ruiz* litigation. Those interdicts were not new, and the fact that court intervention became necessary to compel TDC to comply with them did nothing to alter its antecedent and ongoing obligation to do so. There is also no reason to expect that, by holding the *Ruiz* injunctive decree retroactively applicable, TDC's compliance with constitutional minima will be in any way retarded or hindered; in fact, the opposite may well be the case.

The third and final *Chevron* factor, of whether there would be any inequity in applying the *Ruiz* injunctive decree retroactively, militates against its exclusively prospective application. Any retroactive application to TDC or its official employees merely requires that they have obeyed the law extant at the time of their actions; hence, no inequity is manifested. That, as noted above, is essentially the case presented here, for *Ruiz* forged no "new" law which might be claimed to be unfair where retroactively applied. No inequity of the TDC-inmate § 1983 plaintiffs presents itself, since the retroactive application of the *Ruiz* injunctive decree is actually the most equitable course. To hold otherwise, specifically, that prospective application only is appropriate, would mean that any given

inmate could be denied or accorded application of the *Ruiz* legal doctrine entirely on the basis of *when* his constitutional rights were allegedly violated.

In summary, then, no basis is perceived for holding that the *Ruiz* injunctive decree must be accorded solely nonretroactive application; instead, the *"Johnson*-mandated"* review will proceed under the premise that the *Ruiz* decree, as modified by subsequent stipulations and orders, is to be applied on a fully retroactive basis. It follows that, regardless of when a TDC inmates' § 1983 action is filed, or when the underlying events are alleged to have occurred, the individual claim or claims will be reviewed on the basis of the holdings in *Ruiz.*

An exception to this approach concerns the possible availability to the plaintiff of a contempt-based compensatory fine, for violations of the *Ruiz* injunctive decree. *See Johnson, supra,* at 727 F.2d 501. Prior to the entry of the *Ruiz Amended Decree,* the defendants (either those therein or in the instant case), could not be said to have been constrained by a comprehensive legal mandate from this court; therefore, they cannot be held liable in a contempt proceeding, for any violations of the provisions of the *Ruiz* order occurring prior to its entry.

### C.  *Review of Johnson's Claims*

In several substantive areas, Johnson's instant action poses potential violations of the *Ruiz* injunctive decree, as amended by subsequent stipulations and court orders. Each of Johnson's claims will be reviewed in the chronological order set out above, in Section II, *supra.*

The first incident of which Johnson complains, which relates to the disciplinary hearing held on March 21, 1980, clearly implicates Sections IV.A and IV.B of the *Ruiz Amended Decree,* as well as the parties' stipulation entitled *Stipulation Modifying and Supplementing Sections IV.A and IV.B of the Amended Decree.* Johnson claims violation of his due process rights during the disciplinary hearing, in

his not being permitted to call witnesses in his behalf, and in his being punished under an allegedly non-existent TDC rule. These allegations, if proven true, would comprise violations of the *Amended Decree's* Sections IV.A.1 (requiring all TDC rules to be in written form and adequately distributed); IV.A.6 (requiring that prisoners be informed of their right to present documentary evidence and to call witnesses in their behalf, and that they be routinely allowed to do either, absent legitimate institutional needs dictating otherwise); IV.A.10 (similar to IV.A.6); and IV.A.11 (requiring that defendants follow their own rules and regulations governing disciplinary procedures).

Each of the portions of the *Amended Decree* referring to disciplinary procedures and due process rights were foreshadowed by existent case law well before its entry. *See, e.g., Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (requiring that officials provide at least twenty-four hours advance written notice before hearing of the claimed violation by inmate; that an inmate normally be permitted to call witnesses and present documentary evidence in his behalf; and that the inmate be assisted by some form of substitute counsel where necessary for an effective defense); *Gates v. Collier*, 349 F.Supp. 881 (N.D.Miss.1972), *aff'd* 501 F.2d 1291 (5th Cir.1974) (inmates must not be punished for forbidden actions of which they had no prior notice); *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957) (an agency's failure to follow its own procedural rules and regulations, even if such go beyond those which are constitutionally required, is an independent violation of due process); *United States v. Heffner*, 420 F.2d 809 (4th Cir.1969) (same).

The second incident complained of by Johnson, that of being placed in segregation from October 22 to November 7, 1980, without being taken before a disciplinary committee, would, if substantiated by the evidence, involve violations of the *Amended Decree*, Section IV.A.3 (requiring that institutional security be involved as a justification for physically segregating the inmate, and that a hearing routinely be held

within three days, or within ten days under exceptional circumstances), and of sections III.A.2, III.B.1, and IV. of the stipulated *Administrative Segregation Plan* (requiring that certain pre-hearing and security detention confinement procedures be followed). As to Johnson's allegations of being unreasonably denied the use of his wheelchair, Section II of the *Ruiz Consent Decree* ("Special Needs Prisoners"), requires TDC to "provide all special needs prisoners with adequate medical care, adequate living facilities and working conditions (if appropriate), fair discipline, and protection from other prisoners."

Again, these provisions of the *Ruiz Amended* and *Consent Decree* merely echo then-existent case law. *See, e.g., Wolff v. McDonnell, supra; Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (regarding administrative segregation and Fourteenth Amendment liberty interest); *Wright v. Enomoto*, 462 F.Supp. 397 (N.D.Cal.1976, three-judge court), *aff'd* 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978) (same); *Newman v. Alabama*, 559 F.2d 283 (5th Cir.1977) (recognizing Eighth Amendment constitutional duty of prison officials to provide *all* inmates with reasonably adequate food, shelter, medical care, and other basic necessities).

The third incident related by Johnson, alleged to have occurred on November 12, 1980, once more involves TDC's disciplinary procedures. Implicated in this instance are, yet another time, Sections IV.A and IV.B of the *Amended Decree*, as well as the accompanying *Stipulation Modifying and Supplementing Sections IV.A and IV.B of the Amended Decree. See Amended Decree*, Sections IV.A.1, IV.A.2, IV.A.4, IV.A.6, IV.A.10, and IV.A.11.

The fourth incident, alleged by Johnson, wherein he complains of inadequate administrative grievance procedures, does not involve the *Ruiz* injunctive decree.

The fifth incident as related by Johnson, pertains to allegedly unfair disciplinary procedures during a hearing held on January 5, 1980, and implicates the decretal

provisions referred to in the discussion of the first and third incidents, above.

The sixth incident described by Johnson, of being disciplined for failure to attend an art class, again implicates the provisions of the decree involving disciplinary procedures, specifically, the *Amended Decree*'s Sections IV.A.1 and IV.A.11.

The seventh and final incident which Johnson describes in his original complaint involves the identical disciplinary concerns raised in the discussion of the sixth incident.

## IV. CONCLUSION

■ Johnson's claims, while antedating the entry of the *Ruiz Amended Decree,* are nonetheless to be decided in accordance with the law explicated in the *Ruiz* case, insofar as it is relevant. As detailed in Section III.C, *supra,* all but the fourth of Johnson's claims (that which relates to inadequate administrative grievance procedures) indicate potential violations of the *Ruiz* injunctive decree. The United States Magistrate who ultimately adjudicates the plaintiff's claims may, at his option, choose to sever the plaintiff's non-"*Ruiz*-related" claim for separate resolution, or consolidate it for trial with the other claims involving the *Ruiz* injunctive decree. However, a separate report and recommendations for the disposition of the "*Ruiz*-related" claims should be prepared for the "*Ruiz* court".

An appropriate order will be separately entered contemporaneously herewith (*see* Appendix A), directing the correct procedure for resolving the "*Ruiz*-related" claims, once the action has been restored to the docket of the district court from which it originated. The plaintiff in the instant case, however, will not be able to obtain a civil contempt compensatory fine (described in *Johnson, supra,* 727 F.2d at 501), inasmuch as the events of which he complains all preceded the entry of the *Ruiz Amended Decree.*

1. *Ruiz v. Estelle,* 503 F.Supp. 1265 (S.D.Tex. 1980), *aff'd in part and vacated in part,* 679 F.2d 1115 (5th Cir.), *amended in part,* 688 F.2d 266

## ORDER

In accordance with the memorandum opinion this day entered in the above-entitled and numbered civil action, it is

**ADJUDGED** that, in compliance with the Court of Appeals' mandate in *Johnson v. McKaskle,* 727 F.2d 498 (5th Cir.1984), this, the "*Ruiz* court", finds the instant case to implicate, and pose potential violations of, the *Ruiz* injunctive decree. It is further

**ORDERED** that this civil action shall be, and it is hereby, transferred to the Southern District of Texas, to the court presided over by the Honorable Norman W. Black. It is further

**ORDERED** that the United States Magistrate to whom this action is ultimately assigned, shall comply with the order attached hereto as Appendix A.

## APPENDIX A

### ORDER

In conformance with the decision of the Court of Appeals for the Fifth Circuit in *Johnson v. McKaskle,* 727 F.2d 498 (5th Cir.1984), this, the "*Ruiz* court,"[1] *id.,* at 501, is required to examine the record in the above-entitled and numbered civil action, to determine whether plaintiff asserts "legal or equitable claims directly related to or dependent upon rights adjudicated and incorporated in the *Ruiz* injunctive decree." *Ibid.* After such review of plaintiff's claims, it is,

**ADJUDGED** and **DECLARED** that, if the charges made by plaintiff in his pleadings are taken as true, the actions of the Texas Department of Corrections officials are contrary to the decree, in that they entail violations of certain of its provisions, as well as the stipulations of the parties regarding their enforcement. The alleged infractions are detailed in the memoranda opinion in this case, hereto attached and made a part hereof. It is further

(5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983).

ADJUDGED and DECLARED that plaintiff's legal claims for damages implicate the same decretal values, since they are based on the same actions by TDC officials. It is further

ORDERED, pursuant to 28 U.S.C. § 636(a) and (b), that the United States Magistrate shall be, and he is hereby, DIRECTED to conduct an evidentiary hearing in relation to plaintiff's *"Ruiz*-related" claims, and afterwards to submit to the undersigned judge his proposed findings of fact and recommendations for the disposition of claims. It is further

ORDERED that, in the conduct of such proceedings, the Magistrate shall comply with the directions specified in Exhibit "B", attached hereto and made a part hereof.

## EXHIBIT "B"

## DIRECTIONS TO THE UNITED STATES MAGISTRATE

The United States Magistrate shall convene a pre-trial conference pursuant to Rule 16(c), F.R.Civ.P., at least twenty days prior to hearing or trial, so as to formulate and simplify the issues, and to take such other steps to expedite the disposition of the matter as are provided in Rule 16. The pre-trial order shall be deemed to be an adequate substitute for an order to show cause.

At the pre-trial conference, either plaintiff or defendants may demand a jury, inasmuch as the equitable and legal claims of the plaintiff have been consolidated for trial. If the matter is tried to a jury, the jury's findings as to the facts are conclusive on the court, as to both the equitable and legal claims. *Aiello v. City of Wilmington*, 470 F.Supp. 414 (D.Del.1979); *Solar Kinetics v. Joseph T. Ryerson & Son*, 488 F.Supp. 1237 (D.Conn.1980). *See also: Beacon Theaters v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); Wright & Miller, Federal Practice and Procedure, § 2238.

The burden is on the plaintiff to prove his legal claims for damages by the preponderance of the evidence. If the parties should waive a jury, the Magistrate will, of course, be governed by the same evidentiary standards. At the pre-trial conference mentioned above, the evidentiary standards pertaining to the plaintiff's claim for damages should be explained to him, in detail.

In the discretion of the Magistrate, any claim or claims of the plaintiff not directly related to or dependent upon rights adjudicated and incorporated in the *Ruiz* injunctive decree (that is, a claim or claims not based upon the *Ruiz* decree or the stipulations entered into in pursuance thereof, as mentioned in the memoranda opinion entered in this case on July 26, 1984), may be tried simultaneously with the *Ruiz*-related claims. If the Magistrate elects to try, along with the *Ruiz*-related claim or claims, any additional claim or claims asserted by plaintiff, a separate report and recommendation concerning such other claim or claims should be submitted to the judge to whom this civil action is assigned.

The proceedings authorized by the attached orders relate only to the plaintiff's claim that, with respect to him, the *Ruiz* injunctive decree has been violated. In this proceeding, the plaintiff is *not* authorized to act in behalf of the class; only the attorneys representing the class have authorization and power to act for it.

Finally, a copy of the report and recommendations regarding the plaintiff's *Ruiz*-related claim or claims should be sent to the attorneys representing the class, namely, Turner & Brorby, 477 Pacific Avenue, San Francisco, California 94133, at the same time they are transmitted to the *Ruiz* court.