**Isiah Carl GREEN, Plaintiff-Appellant,**

v.

**Dan V. McKASKLE, Acting Director, Texas Department of Corrections, et al., Defendants-Appellees.**

No. 84–2172.

United States Court of Appeals, Fifth Circuit.

May 5, 1986.

Charles Dewey Cole, Jr., Mineola, N.Y., for plaintiff-appellant.

Isiah C. Green, pro se.

Donna Brorby, William Bennett Turner, San Francisco, Cal., and Joel Berger, N.A. A.C.P. Legal Defense Fund, New York City, for amicus-class of plaintiffs in Ruiz v. McCotter.

Jim Mattox, Atty. Gen., Adrian L. Young, Asst. Atty. Gen., Austin, Tex., and Dennis Dimsey, Atty., Dept. of Justice, Bethesda, Md., for defendants-appellees.

Before GOLDBERG, REAVLEY and GARWOOD, Circuit Judges.

REAVLEY, Circuit Judge:

This appeal comes from judgment in one of the thousands of prisoner civil rights cases on the district court dockets of this circuit. Most of these cases are lying dormant because of the hopelessness of applying the usual rules to incoherent and undecipherable pro se complaints, frequently false and frivolous. In other instances the court does give the case attention, but only by looking at the complaint, deciding its probable lack of merit, and dismissing on the ground of frivolousness or failure to state a claim.

Where the prisoner has not been required and allowed to state the specifics of his claim, dismissal at this stage may be premature and require reversal on appeal. That is our view of the present appeal. After collating Isiah Green's complaints throughout five volumes of record, we are compelled to remand some of those claims to the district court. Before addressing Green's complaints, we review the proper method of screening pro se prisoner civil rights suits. It employs procedures under 28 U.S.C. § 1915(d) (1982) and Fed.R.Civ.P. 12(b)(6) that have been made available by this court during the intervening years of the present litigation.

## I. SCREENING THE PRO SE COMPLAINT: § 1915(d) AND RULE 12(b)(6)

In *Spears v. McCotter*, 766 F.2d 179 (5th Cir.1985), this court encouraged the district courts to flesh out the conclusory statements in pro se pleadings, using interrogatories as well as evidentiary hearings to do so, prior to deciding whether the prisoner can state a claim to satisfy Rule 12(b)(6). Even if a claim is stated, it may fail under § 1915(d) because of frivolousness. The latitude of the district court in screening these cases for this determination bears particular attention.

■ Title 28 U.S.C. § 1915(d) allows a litigant to commence an action in federal court *in forma pauperis* (IFP) if he is unable to afford the cost of litigation. To ensure that this provision is not abused, Congress authorized district courts to dismiss an IFP proceeding under § 1915(d) "if the allegation of poverty is untrue, or if satisfied that the action is frivolous or malicious." A district court may dismiss an IFP proceeding for frivolousness or maliciousness at any time, before or after service of process and before or after the defendant's answer. *See Spears*, 766 F.2d at 180 n. 1 (5th Cir.1985); *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir.1983); *Brown v. Schneckloth*, 421 F.2d 1402, 1403 (9th Cir.), *cert. denied*, 400 U.S. 847, 91 S.Ct. 95, 27 L.Ed.2d 85 (1970).

It is, of course, not always easy to determine whether a claim is frivolous simply by examining the pleadings. Prisoner complaints are notoriously difficult to decipher, and pro se pleadings must be construed liberally. *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Unless the frivolousness of a claim is facially apparent, it is "incumbent upon the court to develop the case and to sift the claims and known facts thoroughly until completely satisfied either of its merit or lack of same." *Jones v. Bales*, 58 F.R.D. 453, 464 (N.D.Ga.1972), *aff'd by adopting the district court's reasoning*, 480 F.2d 805 (5th Cir.1973). In *Watson v. Ault*, 525 F.2d 886, 893 (5th Cir.1976), we approved the use of a questionnaire to develop the factual basis of a prisoner's complaint. Use of such questionnaires is now standard practice in this circuit.

To further aid in the development of the facts of a case, in *Spears* we authorized district courts to direct magistrates to hold an evidentiary hearing to determine if a claim is frivolous under § 1915(d). It was our belief that a "magistrate's findings and recommendations should prove of greater aid than a prisoner's written answers on a questionnaire." 766 F.2d at 182. After the hearing, if the facts so indicate, the magistrate may recommend that IFP status be revoked. *Id.* at 180 n. 1.

■ District courts are vested with especially broad discretion in making the determination of whether an IFP proceeding is frivolous. *See Jones v. Bales*, 58 F.R.D. at 464; *Watson v. Ault*, 525 F.2d at 891–92; *Montana v. Commissioners Court*, 659 F.2d 19 (5th Cir.1981); *Holloway v. Gunnell*, 685 F.2d 150 (5th Cir.1982). This circuit is not alone in granting such broad discretion. *See, e.g., Anderson v. Coughlin*, 700 F.2d 37 (2d Cir.1983); *Collins v. Cundy*, 603 F.2d 825 (10th Cir.1979); *Milton v. Nelson*, 527 F.2d 1158 (9th Cir.1976); *Daye v. Bounds*, 509 F.2d 66 (4th Cir.), *cert. denied*, 421 U.S. 1002, 95 S.Ct. 2404, 44 L.Ed.2d 671 (1975). Broad discretion is necessary because "[t]he Federal Rules of Civil Procedure are inadequate to protect the courts and defendants ... from frivolous litigation from indigent prisoners." *Jones v. Bales*, 58 F.R.D. at 463.

Unlike most litigants, prisoners have everything to gain and nothing to lose by filing frivolous suits. Filing a suit *in forma pauperis* costs a prisoner little or nothing; time is usually of little importance to a prisoner and prisoners are not often deterred by the threat of possible sanctions for malicious or frivolous actions or perjury. Moreover, a prisoner, while he may be unsuccessful, can at least look forward to "a short sabbatical in the nearest federal courthouse." *Cruz v. Beto*, 405 U.S. 319, 327, 92 S.Ct. 1079, 1084, 31 L.Ed.2d 263, 271 (1972) (Rehnquist, J., dissenting).

Thus, the temptation to file frivolous or malicious suits is strong, and these suits clutter up the federal courts, wasting scarce and valuable judicial resources, subjecting prison officials unnecessarily to the burdens of litigation and preventing prisoner suits with merit from receiving adequate attention.

The difficult task is "winnow[ing] out the wheat from the unusual amount of chaff necessarily presented in a system which fosters pro se litigation." *Watson v. Ault,* 525 F.2d at 890. This court has stated three standards which district courts may use to determine whether a claim is frivolous. The first requires a determination of whether the IFP complaint has a "realistic chance of ultimate success." *Jones v. Bales,* 58 F.R.D. at 464. *See also Anderson v. Coughlin,* 700 F.2d at 45 (dismissal appropriate if plaintiff's reasonable chance of ultimate success is slight). The second requires that the complaint have "arguable merit ... in terms of the arguable substance of the claim presented, both in law and in fact." *Watson,* 525 F.2d at 892. The third prohibits dismissal "unless the court is satisfied 'beyond doubt' that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bienvenu v. Beauregard Parish Police Jury,* 705 F.2d 1457, 1459 (5th Cir. 1983) (citations omitted). We think that the concept of frivolousness in § 1915(d) is broad enough to support dismissal on any of these grounds.

We emphasize the uniqueness of a § 1915(d) determination. It is not to be confused with determinations made under the Federal Rules. *See Anderson,* 700 F.2d at 43. The Federal Rules of Civil Procedure, particularly Rule 8, instituted a system which relies on a liberal opportunity for discovery and other pretrial procedures to disclose more precisely the basis of both a claim and a defense and to define more narrowly the disputed facts and issues. Such a system is desirable in the majority of cases, but it contemplates litigants who are limited by considerations of time, money and the possibility of sanctions for frivolous or malicious actions. It also contemplates litigants who are represented by counsel schooled in the use of the system.

IFP litigation under § 1915 is of a "fundamentally different nature." *Anderson,* 700 F.2d at 43. Section 1915 provides free access to the courts. Care must be taken to ensure that such access is not abused. We must not kill the goose which lays the golden egg. As one commentator noted several years ago, "[the] upsurge in [IFP proceedings] is said to threaten both efficient judicial administration and the achievement of justice in individual cases, creating the possibility that judges will not be able to identify the meritorious cases in the flood of those deemed frivolous." Turner, *When Prisoners Sue: A Study of Prisoner Section 1983 Suits in the Federal Courts,* 92 Harv.L.Rev. 610, 611 (1979). The predicted possibility is now common fact.

Proper use of § 1915(d) procedures should enable a district court to determine at the earliest possible stages in pro se litigation whether there is any merit to an IFP proceeding. Of course, our discussion of *Spears* should not be interpreted to mean that all or even most prisoner claims require or deserve a *Spears* hearing. A district court should be able to dismiss as frivolous a significant number of prisoner suits on the complaint alone or the complaint together with the *Watson* questionnaire. An early determination of the merits of an IFP proceeding provides a significant benefit to courts (because it will allow them to use their scarce resources effectively and efficiently), to state officials (because it will free them from the burdens of frivolous and harassing litigation), and to prisoners (because courts will have the time, energy and inclination to give meritorious claims the attention they need and deserve). "We must take advantage of every tool in our judicial workshop." *Spears,* 766 F.2d at 182.

In this case the magistrate did not hold an evidentiary hearing. Also, no review seems to have been made to review Green's claims under § 1915(d) or Rule 12(b)(6) to

determine whether they adequately stated a claim against each defendant. According to recent Supreme Court decisions, in order to state a § 1983 cause of action for violation of rights afforded by the Fourteenth and Eighth Amendments, a prisoner must allege facts sufficient to establish that prison officials were deliberately indifferent to those rights. *See, e.g., Daniels v. Williams,* ⸺ U.S. ⸺, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (Fourteenth Amendment); *Davidson v. Cannon,* ⸺ U.S. ⸺, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (Fourteenth Amendment); *Whitley v. Albers,* ⸺ U.S. ⸺, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (Eighth Amendment). By analyzing prisoner claims under these decisions, a district court should be able to dismiss many defendants and claims.

## II. ISIAH GREEN'S CASE

### A. *Green's Complaints*

Over a period of five years from October of 1978 to October of 1983 Green mailed to the federal district clerk's office a steady paper stream of some eleven pleadings plus numerous affidavits and other instruments which were filled with surplusage and conclusory claims of unconstitutional treatment. A paraplegic, Green complained of his hospital ward confinement and all restrictions on his movement and access that were not shared by other prisoners, along with other grievances.

### B. *Disposition in the District Court*

Green's claims were dismissed at different stages and for different reasons. For example, his claims that he was denied a reasonable opportunity to contest his assignment to administrative segregation and that he was denied privileges available to other inmates which should have been reasonably available to him were dismissed on the ground that they failed to state a claim on which federal relief could be granted. Many of his claims were dismissed by summary judgment, and the ruling on some of the claims was that "good faith" immunity protected the defendants.

### C. *Prior Proceedings in This Court*

When this appeal[1] first came to the panel, we followed the lead of the *Johnson*[2] decision and directed that Green's equitable and legal claims be referred to the district court that fashioned the *Ruiz* class action injunctive decree. *Green v. McKaskle,* 770 F.2d 445 (5th Cir.1985). We suggested, however, that *Johnson* be reconsidered *en banc*. The full court accepted that suggestion. *Green v. McKaskle,* 772 F.2d 137 (5th Cir.1985). When Green withdrew his equitable claims after his release on parole, the case was returned to us.[3] Thus, we

---

**1.** This court reversed the district court in a prior interlocutory appeal. *See Green v. Estelle,* 649 F.2d 298 (5th Cir.1981).

**2.** In *Johnson v. McKaskle,* 727 F.2d 498 (5th Cir.1984), a panel of the Fifth Circuit held that individual inmate's claims for equitable relief were not barred by the *Ruiz* class action because the claims were based on actions which occurred after judgment in the class action. In addition, to "ensure a minimal, consistent degree of federal intervention in the affairs of the TDC, evenhanded, effective relief for TDC inmates, and the orderly administration of an injunctive decree by the court that authored and is administering it," the *Johnson* court had directed that all claims by TDC inmates, both equitable and legal, be "filtered" through the *Ruiz* court. *Johnson* at 501.

**3.** Green's appeal raised four principal issues: (1) the preclusive effects of equitable relief granted in a class action on subsequent equitable claims brought by members of the class; (2) the proper procedures for disposing of individual prisoner suits in the wake of *Ruiz v. Estelle,* 503 F.Supp. 1265 (S.D.Tex.1980); (3) the summary dismissal of Green's legal claims; and (4) whether *"Ruiz"* law as embodied in the *Ruiz* opinion, remedial decree and subsequent modifications could serve as a basis for damage suits under § 1983. The *en banc* court agreed to hear *Green* because of the prior ruling by the *Johnson* panel on the first two issues. When the first issue was mooted by Green's parole and the second was resolved through action by the Judicial Council of the Fifth Circuit and vacation of the prior writing by the *Johnson* panel (unpublished order Dec. 5, 1985), the remaining two issues—without prior panel consideration—were regarded as premature for *en banc* attention.

consider only Green's legal claims in this appeal.

### D. *The Merits of This Appeal*

#### 1. *Applicable Law:*

In evaluating the claims of constitutional deprivation made by Green, we are met with a preliminary question of whether the definition of those deprivations has been enlarged by the decrees entered in the *Ruiz* class action. In December 1974, the United States District Court for the Eastern District of Texas certified a plaintiff class composed of all past, present and future inmates confined by the Texas Department of Corrections (TDC). The class brought suit challenging the constitutionality of almost all aspects of confinement in TDC prisons. After a lengthy trial ending September 20, 1979, the court detailed the "constitutional infirmities [which] pervade the TDC prison system." *Ruiz v. Estelle*, 503 F.Supp. 1265, 1391 (S.D.Tex.1980). On May 1, 1981, the court entered an extensive remedial decree, setting forth in considerable detail the actions required of TDC to remedy the constitutional defects in its prisons. The provisions of the remedial decree have been modified substantially, either by the Fifth Circuit, *see Ruiz v. Estelle*, 679 F.2d 1115 (5th Cir.1982), or by the parties themselves in the form of stipulated modifications.

Upon remand of *Johnson v. McKaskle*, the *Ruiz* court stated that, for purposes of establishing liability for damages under § 1983, "*Ruiz* law" would include not only the conclusions of law set forth in its opinion in *Ruiz v. Estelle*, 503 F.Supp. 1265, but it would also include the provisions of the *Ruiz* remedial decree and all stipulations, plans and court orders subsequently filed. *Johnson v. McKaskle*, 591 F.Supp. 511, 513–15 (S.D.Tex.1984). The court also determined that *Ruiz* law would have retroactive application. *Id.* Because Green was a member of the *Ruiz* class, before appraising the weight of his claims we must determine whether this decision by the *Ruiz* court was correct. For the reasons stated below, we conclude that the *Ruiz* court's suggested application of *Ruiz* law to suits for damages under § 1983 would be improper.

■ First, applying *Ruiz* law retroactively would be either unfair or unnecessary. Prison officials are liable for damages in suits brought by prisoners under § 1983 only if their conduct violates "clearly established" rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Every prison official sued for allegedly violating a prisoner's constitutional rights is therefore entitled to assert that those rights were not clearly established at the time of the alleged violation. Applying *Ruiz* retroactively would violate this right and unfairly subject a prison official to suit for alleged violations of rights of which he could not have reasonably known. *Cf. Leonard v. Mississippi State Probation and Parole Board*, 509 F.2d 820, 825 (5th Cir.1975). On the other hand, if the district court correctly concluded that "there is very little in the [*Ruiz*] decision which ... made novel law, or ... established new precedent," retroactive application of *Ruiz* itself is unnecessary: the law was already clearly established. We will not give *Ruiz* law retroactive application.

■ Second, the *Ruiz* court was incorrect in stating that its remedial decree and all subsequent stipulations, plans and court orders could serve as a basis for a § 1983 damage claim. No doubt the *Ruiz* court's delineation of constitutional rights, as affirmed by this court or unchallenged by the parties, is important and may be grounds for § 1983 liability in the *Ruiz* court or other courts. Furthermore, the *Ruiz* order may bear on a qualified immunity defense. A remedial decree affirmed on appeal might be important for purposes of providing notice to prison officials of clearly established rights. *See, e.g., Williams v. Bennett*, 689 F.2d 1370, 1386 (11th Cir. 1982) ("[remedial court] order not only clearly defined the constitutional rights of the Alabama prisoners, but also served to put the defendant[s] on notice"); *Jackson*

*v. State of Mississippi,* 644 F.2d 1142, 1146 (5th Cir.1981) (remedial decree "clearly established ... constitutional rights"). But remedial court orders per se, apart from independent constitutional grounds affirmed there, cannot serve as a substantive basis for a § 1983 claim for damages because such orders do not create "rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (1982).

■ The law has traditionally distinguished between constitutional rights and remedies enforcing those rights. *Cf. Chelentis v. Luckenbach S.S. Co.,* 247 U.S. 372, 384, 38 S.Ct. 501, 504, 62 L.Ed. 1171, 1176 (1918) ("the distinction between rights and remedies is fundamental"). This distinction is implicit in those decisions which have considered the authority possessed by district courts in developing the broad remedial decrees often necessary in civil rights actions. *See, e.g., Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554, 566 (1971) ("the nature of the [constitutional] violation determines the scope of the remedy"); *Newman v. Alabama,* 559 F.2d 283, 288 (5th Cir.1977) (aspects of a complex remedial decree, which, "if considered in isolation, may have gone beyond constitutional mandates[,] ... were justifiably invoked for the eradication of Eighth Amendment conditions"), *rev'd on other grounds sub nom. Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). It is clear from these decisions that remedial decrees are the means by which unconstitutional conditions are corrected but that they do not create or enlarge constitutional rights.

The next question is whether remedial decrees create "rights ... secured by the ... laws," 42 U.S.C. § 1983 (1976), sufficient to serve as a basis for liability under § 1983. For two reasons we think that they do not. First, while the Supreme Court has been divided over what statutes may serve as a basis for liability under § 1983, the Court, and lower courts, have never expressed any doubt that § 1983 pro-

vides a cause of action only for deprivations of constitutional or statutory rights. *See, e.g., Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980) (concluding only that "the § 1983 remedy broadly encompasses federal statutory as well as constitutional law"). Second, the same rationale used by the Supreme Court to determine which federal statutes contain rights actionable under § 1983 also suggests that Court orders do not establish rights actionable under § 1983. According to the Court, "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Middlesex County Sewerage Authority v. National Sea Clammers Assoc.,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981). By analogy, since there are "remedial devices" (contempt) in place to ensure the enforcement of court orders, there is no need to allow court orders to serve as the basis of § 1983 liability.

The need to distinguish between the right and the remedy is particularly important in a conditions of confinement suit. Many of the details of the injunctive relief are negotiated and settled by the parties. Even where the court enters its own decree (which cannot go beyond acceptable remedies for constitutional requirements), the parties may thereafter agree on and obtain substantial modifications of the court's decree. They may arrive at agreed stipulations that are extremely detailed which can and do go far beyond constitutional requirements. While it may be possible to question the wisdom of setting forth such detailed prescriptions in court orders enforceable by contempt, unquestionably such detail provides significant benefits to prisoners. Allowing a prisoner to bring a damage claim under § 1983, in addition to contempt proceedings, for a violation of a court order approving stipulations and plans would discourage prison officials from agreeing to such benefits.

Another consideration is that prison officials need latitude in setting priorities for

the implementation of the remedial decree. Prison officials have limited resources with which to comply with the usual wide-ranging remedial decrees entered in prison class actions. Acting in good faith they may be compelled to choose, perhaps after consulting the class representatives, where to place available resources. If individual prisoners can seek damages for violations of every detail of a remedial decree, compliance would be deterred by the hopelessness of defendants' position.

Finally, allowing remedial orders to serve as a basis for § 1983 liability would raise serious problems regarding the ability to give notice to potential defendants preparing themselves conscientiously for the shelter of qualified immunity. A prison official is entitled to the defense of qualified immunity "insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738, 73 L.Ed.2d at 410. While it is reasonable to expect a prison official to know the broad outlines of constitutional law as they apply to the conduct of prison officials, even as set forth in an initial remedial decree, *see Williams,* 689 F.2d at 1386; *Jackson,* 644 F.2d at 1146, at some point it becomes unreasonable to expect a prison official to learn the details of thousands of pages of stipulations and compliance plans. We conclude therefore that a remedial court order, standing alone, does not serve as the basis for § 1983 liability.

### 2. *Constitutional Case or Controversy*

As one ground for its grant of summary judgment in favor of defendants, the district court concluded that Green's claims could be dismissed because they did not state a constitutional case or controversy. According to the court, "nowhere does plaintiff Green allege that he has suffered actual injury. There is no substantiation of his claims of pain, suffering, and humiliation that would constitute a basis for awarding him damages, or present a case or controversy justifiable by the federal courts."

While there is no question that a federal court must be presented with a "case or controversy" before it can sit in judgment of a dispute, we do not agree with the district court's conclusion that Green's claims did not fulfill this jurisdictional requirement. Green repeatedly alleged that his constitutional rights were violated. He also repeatedly alleged that he had received injuries due to those violations. While Green stated on several occasions in his pleadings that he could not prove the actual extent of his injuries, this does not defeat his right to maintain an action for damages for the alleged violation of constitutional rights. A plaintiff may recover nominal as well as punitive damages even if a violation of his civil rights causes no actual injury. *Farrar v. Cain,* 756 F.2d 1148, 1152 (5th Cir.1985); *Ustrak v. Fairman,* 781 F.2d 573, 581 (7th Cir. 1986). *See also Carey v. Piphus,* 435 U.S. 247, 266–67, 98 S.Ct. 1042, 1054, 55 L.Ed.2d 252, 266 (1978); *Ganey v. Edwards,* 759 F.2d 337, 339 (4th Cir.1985); *Madison County Jail Inmates v. Thompson,* 773 F.2d 834, 844 (7th Cir.1985). Because Green's complaints alleged violations of his constitutional rights, for which if proved he could receive at least nominal damages, he presented the district court with a case or controversy sufficient to invoke the court's jurisdiction.

### 3. Green's Specific Claims

Boiling down the complaints in these record volumes, we arrive at seven specific claims which deserve discussion.

a. Green alleged that the defendants had denied him a reasonable opportunity to challenge his assignment to administrative segregation. The trial court dismissed this claim as not being one for which relief could be granted, citing *Young v. Wainwright,* 449 F.2d 338, 339 (5th Cir.1971) ("classification of inmates is a matter of prison administration and management with which federal courts are reluctant to inter-

fere except in extreme circumstances"), and *Jones v. United States*, 534 F.2d 53, 54 (5th Cir.1976), *cert. denied*, 429 U.S. 978, 97 S.Ct. 487, 50 L.Ed.2d 586 (1976) (prison officials have broad discretion, free from judicial interference, in classifying prisoners in terms of their custodial status). We agree with the district court that both *Young* and *Jones* give prison officials broad discretion in classifying inmates. But when regulations governing the administration of state prisons create a liberty interest in remaining free from the restraints accompanying confinement in administrative confinement, a prisoner is entitled to the minimum requirements of procedural due process. *Hewitt v. Helms*, 459 U.S. 460, 471–72, 103 S.Ct. 864, 871, 74 L.Ed.2d 675, 688 (1983); *Mitchell v. Hicks*, 614 F.2d 1016, 1018–19 (5th Cir.1980); *Wright v. Enomoto*, 462 F.Supp. 397 (N.D.Cal. 1976), *summarily aff'd*, 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978). Green's pleadings do therefore state a claim for relief. He alleges that his due process rights were violated when he was transferred to administrative segregation because he was not given the opportunity to object to his change in classification. If he could support his claim by showing that TDC's prison regulations authorized his transfer to administrative segregation only for specified reasons and that the procedure allowed no protection of this liberty interest, Green could prove a violation of his due process rights. *See Mitchell*, 614 F.2d at 1019.

b. Green alleged that the defendants violated his right to equal protection while he was in administrative segregation because he was denied the same privileges, exercise periods and educational rehabilitative programs open to other prisoners. Quoting *Newman v. State of Alabama*, 559 F.2d 283, 291 (5th Cir.1977), the district court dismissed this claim under Rule 12(b)(6) on the ground that "[t]he Constitution does not require that prisoners ... be provided with any and every amenity which some person may think is needed to avoid mental, physical and emotional deterioration." Prison officials may, of course, arbitrarily determine whether to provide prisoners with privileges amounting to more than "reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Id.* But the state's power to distinguish between prisoners is always subject to the constitutional requirement that substantial and purposeful difference in treatment have some rational basis rather than being wholly arbitrary and capricious. *Fulford v. King*, 692 F.2d 11, 13 (5th Cir. 1982); *see Nadeau v. Helgemoe*, 561 F.2d 411, 416 (1st Cir.1977). It may be highly unlikely that Green can justify his claim or raise a fact issue that the denial of his privileges met these requirements. Except for some denials of a fundamental right or use of a suspect classification, prison policy can be based on such considerations as administrative convenience, expense or security. *Id. See also Dorrough v. Hogan*, 563 F.2d 1259, 1262–63 (5th Cir.1977) (restricting privileges afforded to prisoners in administrative segregation in federal prison did not violate equal protection because it was a necessary part of prison security). Green, however, has stated a claim.

c. We likewise remand to the district court Green's claims that he was discriminated against because he was handicapped. There may, of course, be a rational reason why a handicapped prisoner is not allowed the freedom of movement and access that other prisoners have. "TDC has no obligation to make prison life the same for physically handicapped inmates as it is for others." *Ruiz*, 503 F.Supp. at 1346. If, however, possible justification is entirely lacking, Green may have stated a claim against one or more of the defendants. In deciding a defense of qualified immunity, the district court will follow the procedure

explained in *Elliott v. Perez*, 751 F.2d 1472 (5th Cir.1985).

 d. Green complained at length about the denial of food, clothing, exercise and sanitation. He alleged, for example, that he was forced to crawl to the commode in his cell to wash himself. The district court acted prematurely in dismissing these claims on the ground of the qualified immunity of the defendants. The Fifth Circuit stated in September of 1977 that a state must "furnish[ ] its prisoners with reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety" to satisfy constitutional requirements. *Newman*, 559 F.2d at 291.

 e. Green alleged that while in administrative segregation and in the hospital his only access to the courts was his ability to check out two to three books each day. The TDC policy on the use of legal materials by prisoners in administrative segregation, which was filed with the trial court, confirms Green's allegation. There is no showing, however, why this restriction on access to legal materials was justified under the requirements of the Constitution. *See Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Morrow v. Harwell*, 768 F.2d 619 (5th Cir.1985). Summary judgment against Green's claim was not justified by this record.

 The preceding claims should not have been dismissed as they were by the district court. It may be that some or all of them may still be properly disposed of by summary proceedings. The district court may give the parties an opportunity to submit further support for their respective positions before moving to trial on the merits.

 f. We agree with the trial court's summary judgment against Green's claim of denial of access to religious services. The Constitution requires that "reasonable opportunities must be afforded to all prisoners to exercise ... religious freedom." *Cruz v. Beto*, 405 U.S. at 322 n. 2, 92 S.Ct. at 1081 n. 2, 31 L.Ed.2d at 268 n. 2 (1972). Green attached to his objections to the magistrate's report a copy of Warden Pursley's order that the Huntsville Jaycees assist Green in attending a Baptist church service every Sunday. Apparently the order was largely carried out. Although this was not enough for Green—there was more than one service per day available which he would have liked to attend and he was prevented by circumstances from attending an occasional service—this order provided Green a reasonable opportunity to practice his religion. His constitutional right to freedom of religion was not violated.

 g. Green made numerous claims of denial of proper medical care. The Eighth Amendment only protects Green from "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251, 267 (1976). Green conceded in his brief that "the district court may well have been correct in concluding that most of the facts concerning his medical treatment did not cross the 'deliberate indifference' threshold." We agree with this assessment. On appeal, however, Green asserts that the facts regarding two allegations of his medical treatment—lack of proper medical facilities for paraplegics and lack of a physician in treating paraplegics—were sufficient to withstand summary judgment. With this we do not agree.

Green's claim that he was denied proper medical facilities revolves around his claim that he was denied a bed equipped with a proper mattress and trapeze. This is in essence a claim that he was subjected to the danger of developing bedsores, as Green explicitly stated in his pleadings. There is no question that allowing bedridden prisoners to develop bedsores may demonstrate deliberate indifference to the needs of those prisoners. *See, e.g., Ruiz v. Estelle*, 503

F.Supp. at 1346. Green, however, never indicated in any of his pleadings nor did his medical records indicate that he ever developed bedsores. Moreover, Green did not contest the fact that he was provided with assistance in turning in his bed in order to prevent the development of bedsores. He thus has not raised an issue of deliberate indifference to his serious medical needs. Furthermore, the mere claim that he was not afforded a doctor who specialized in the treatment of paraplegia or a trained physical therapist does not, of itself, state a claim of deliberate indifference.

We therefore affirm the district court's judgment in part and reverse it in part. The case is remanded to that court for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.