Anthony DeGIDIO, James Murray, Antti John Haavisto, individually, and on behalf of all others similarly situated, Appellees/Cross–Appellants,

v.

Orville B. PUNG, individually, Robert Erickson, individually, Sister Mary Madonna Ashton, individually, Appellants/Cross–Appellees.

St. Paul–Ramsey Medical Center, John Does and Jane Roes their employees, agents and servants whom are unidentified and unknown at this time.

Nos. 89–5484, 89–5505.

United States Court of Appeals, Eighth Circuit.

Submitted June 14, 1990.

Decided Dec. 4, 1990.

Richard S. Slowes, St. Paul, Minn., for appellants/cross-appellees.

Arlo H. Vande Vegte, Long Lake, Minn., for appellees/cross-appellants.

Before MAGILL and BEAM, Circuit Judges, and ROSS, Senior Circuit Judge.

BEAM, Circuit Judge.

Anthony DeGidio and several other inmates at the Minnesota Correctional Facility at Stillwater filed this class action lawsuit in April of 1984, under 42 U.S.C.

§ 1983 (1988), alleging that the tuberculosis screening and control procedures at Stillwater were so inadequate that they constituted cruel and unusual punishment in violation of the eighth amendment. On January 19, 1989, following a nonjury trial, the district court[1] found that the eighth amendment had been violated. However, the court denied injunctive relief[2] because the eighth amendment violations had been remedied during the course of this litigation. In a separate, unreported opinion dated August 16, 1989, the district court, finding that this lawsuit spurred many of the remedial changes, held that the plaintiffs were prevailing parties and ordered Orville Pung[3] to pay $210,303 in attorneys' fees and costs. *See* 42 U.S.C. § 1988 (1988).

On appeal, Pung contends that the district court erred in finding that the procedures for tuberculosis prevention and control at Stillwater violated the eighth amendment and erred in finding that this lawsuit was a catalyst for the remedial changes that were made. In his cross-appeal, DeGidio alleges that the district court erroneously calculated the amount of the fee award and incorrectly held that a previous consent decree relating to medical care at Stillwater could not be enforced in a section 1983 action.

## I. BACKGROUND

The trial in the district court lasted thirty-one days, and voluminous exhibits and extensive testimony were received in evidence. The district court made extensive findings of fact which, along with its conclusions of law, are set forth in *DeGidio v. Pung*, 704 F.Supp. 922 (D.Minn.1989). Because of the extensive recitation of the facts in the district court's opinion, we set forth only a brief review of the relevant facts here.

Tuberculosis is a communicable disease that generally affects the lungs, but also appears in other organs of the body. It is transmitted by the tubercle bacilli that are present in the lungs of infected individuals and are expelled by talking, coughing or sneezing. Tuberculosis exists in both dormant and active stages. During the dormant stage, the individual is not infectious and exhibits no symptoms. Only a few infected individuals develop active tuberculosis. With proper treatment—daily dosages of the antibiotic isoniazid (INH) for nine to twelve months—an infected person probably will never develop active tuberculosis. If the infection becomes active and established in the lungs, however, the individual becomes infectious. Active cases of tuberculosis are treated with INH and other antibiotics and must be isolated until no longer infectious—generally one to two weeks after treatment begins. Tuberculosis can spread to other individuals who share air for prolonged periods with an individual infected with an active case of pulmonary tuberculosis.

Prisons are high risk environments for tuberculosis infection.[4] Thus, screening and control measures are necessary to prevent outbreaks. Mantoux skin testing[5] is the recommended method of tuberculosis screening. If the Mantoux test indicates the possibility of infection, a chest x-ray and sputum testing are used to verify the diagnosis and reveal whether the infection is active. A single Mantoux test is not always determinative. An infection that occurs within eight to ten weeks before testing may not cause a positive reaction.

1. The HONORABLE DIANA E. MURPHY, District Judge for the District of Minnesota.

2. At this point, the plaintiffs sought only injunctive relief.

3. The issues on appeal are common to all appellants. Thus, our references to Pung include the other appellants.

4. Several factors contribute to this situation. Prisoners live in close quarters, they share air that has been mechanically recirculated and has not been exposed to sunlight or ultraviolet light, and the influx of fresh air is limited.

5. In the Mantoux test, a purified protein derivative of tuberculin is injected under the skin on the forearm. The site of the injection is examined forty-eight to seventy-two hours later. An infected individual reacts with a hard swelling, or induration, measuring at least ten millimeters.

Thus, follow-up testing is necessary to adequately screen for tuberculosis infection.

In a prison environment, if tuberculosis infection is not discovered or preventive therapy is not followed, active cases of tuberculosis are likely to develop. At Stillwater, the first case of active tuberculosis in ten years was diagnosed in November of 1982. During the next few years, widespread tuberculosis infection was discovered.

## II. DISCUSSION

### A. Attorneys' fees

■ The district court found that, until 1986, the response to the tuberculosis outbreak at Stillwater consisted of a series of negligent and reckless acts exhibiting deliberate indifference to the serious medical needs of the inmates. However, the court denied DeGidio's request for injunctive relief because, as indicated, the constitutionally inadequate conditions had been remedied by the time of trial. By mid–1986, officials at Stillwater had implemented extensive screening and control practices, adopted a published tuberculosis control policy, and had supplemented inadequate medical staffing. *DeGidio*, 704 F.Supp. at 959–60.

The court found that this lawsuit spurred the substantial improvements which effectively alleviated the eighth amendment violations at Stillwater. The court held that inadequate attention had been given to the serious medical needs of inmates at Stillwater in the absence of litigation and public scrutiny. Further, the court noted that changes that had been made before this litigation were often slow and inadequate. Thus, pursuant to section 1988,[6] the court awarded DeGidio attorneys' fees and costs. The court reduced the requested award of attorneys' fees by sixty-five percent and reduced the requested award of costs by seventy-five percent. The reduction was based on the limited relief obtained balanced against the success achieved in causing the improvements in prison conditions.

*See* Memorandum Opinion and Order, 723 F.Supp. 135 (D.Minn.1989).

On appeal, Pung contends that the changes which were incorporated during the pendency of this lawsuit were made in response to the escalating tuberculosis problem at Stillwater and because of changes in the personnel at the Minnesota Department of Health who guided the tuberculosis surveillance at Stillwater. Thus, the lawsuit was not an important and necessary factor leading to the changes and the district court erred in finding that DeGidio was a prevailing party entitled to attorneys' fees.

Although DeGidio did not obtain the injunctive relief sought, the district court found, also as indicated, that this lawsuit was a catalyst that brought about changes in the health care at Stillwater that were required to alleviate violations of the eighth amendment. Thus, if the court's finding is correct, attorneys' fees are appropriate even though relief on the merits was not obtained. *United Handicapped Fed'n v. Andre*, 622 F.2d 342 (8th Cir. 1980); *Williams v. Miller*, 620 F.2d 199 (8th Cir.1980). To be considered a prevailing party and be entitled to attorneys' fees, Degidio must establish a causal link between this lawsuit and the remedial changes made by Pung. The district court held, as a matter of fact, that DeGidio established this link. The district court's findings set forth above amply support the conclusion that this lawsuit spurred the remedial changes.

Causal connection, however, is only one-half of the test for prevailing party status. A plaintiff must also prove that the remedial changes were required by law. *United Handicapped*, 622 F.2d at 346–48. Pung asserts that because the conditions at Stillwater and the response to the tuberculosis outbreak did not violate the eighth amendment the district court erred in finding that DeGidio was a prevailing party. Pung as-

---

**6.** Section 1988 provides: "In any action or proceeding to enforce a provision of sections 1981, 1982, [and] 1983 ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988 (1988).

serts that we review this finding de novo.[7] *See id.* at 346–47. If the district court correctly found an eighth amendment violation, then the changes were legally required. Thus, to determine the propriety of the district court's award of fees, we must review the underlying eighth amendment finding.

DeGidio's eighth amendment claim was based upon Stillwater's policies and procedures relating to tuberculosis control as well as the diagnosis and treatment of several inmates who developed active tuberculosis. The first relevant case of active tuberculosis at Stillwater was discovered in October of 1982. During the next few years, almost two hundred inmates became infected.[8] Additionally, at least eight inmates were diagnosed with active tuberculosis. Thus, DeGidio clearly established that a serious risk to the inmates' health existed.

The district court found that Stillwater lacked adequate organization and control in the administration of health services. Apparently, no one was responsible for the overall supervision and control of health services at Stillwater from 1981 through 1986. The health services administrator and the director of special services, who replaced the health services administrator in 1982, were responsible for administrative matters and had no role in providing medical care. Several doctors served as medical director from 1970 through 1986. From 1981 through 1985, the part-time physicians employed at Stillwater viewed their roles solely as providers of clinical services. They disclaimed any responsibility for developing or instituting communicable disease control policies. In July of 1986, Dr.

Eyunni, who has training in public health and institutional medicine, became medical director and assumed control over the administration of medical services at Stillwater. Apparently, Dr. Eyunni has taken an active role in the health care administration and has now provided the organization and control that had been lacking.

Until 1986, Stillwater did not have a written protocol regarding tuberculosis testing and control. In fact, before the first case of tuberculosis was discovered in October of 1982, little information about tuberculosis, none of which was prison-specific, was available at the prison. Although no written policy existed, new prisoners were screened for tuberculosis during their intake examinations. Mantoux skin tests were given to all incoming inmates, except inmates with past positive tests, transferred inmates and inmates who had been out of prison less than six months. The district court found that Stillwater's intake screening was deficient because not all incoming inmates were tested and because two-step testing (follow-up test eight to ten weeks after initial test) was not done.

The district court found that Stillwater's method of INH preventative treatment was deficient. INH was given to infected inmates in monthly allotments of 300 milligrams per day. Because inmates were given monthly allotments, health officials could not monitor actual intake of the drug. In 1984, because of concern that inmates were not taking the drug, INH was distributed in seven-day allotments and inmates suspected of not complying with the therapy were questioned and encouraged to comply. Directly observed therapy (DOT)[9]

---

7. Frequently, a dispute over attorney's fees arises after a lawsuit is settled before the district court makes a determination on the merits of the claims. In such cases, an award of fees is appropriate if the lawsuit was a catalyst for the resolution of the conflict and if the resolution was required by law. *See United Handicapped,* 622 F.2d at 346–48. The district court is not required to conduct a trial to determine whether the required by law test has been met. A finding that the lawsuit was not frivolous, unreasonable or groundless suffices. *Id.* at 347. This is the legal part of the prevailing party test subject to de novo review. Here, the district court found a constitutional violation following

a trial on the merits. Thus, whether the remedial changes were required by law hinges solely on our review of the district court's finding of an eighth amendment violation.

8. Pung disputes the district court's holding that "several hundred inmates" became infected. He does not, however, dispute that the tuberculosis problem was serious.

9. A plan of directly observed therapy involves a staff member watching the inmate ingest each prescribed dose of INH.

was instituted in 1986 for inmates suspected of noncompliance. Finally, in 1987, INH was administered biweekly in 900 milligram doses and monitored with DOT.

The district court also found that Stillwater's response to the outbreak of active tuberculosis was deficient. The court found that a lack of general awareness of the potential threat of tuberculosis and the lack of guidance from the health services administrators caused delayed diagnoses of active cases and inadequate responses when active cases were discovered. Specifically, the court found that the failure to consider that inmate Antti Haavisto may have had active tuberculosis before October 14, 1982, demonstrated deliberate indifference to Haavisto's and the other inmates' serious medical needs. Haavisto's intake Mantoux test in March of 1982 was positive and he complained of pulmonary symptoms. The radiologist who read his chest x-ray, without knowledge of the positive Mantoux test, however, found no evidence of tuberculosis. Haavisto made several trips to health services over the following months complaining of coughing and back and chest pain. Additional chest x-rays were taken and antibiotics were prescribed; active tuberculosis apparently was not considered. On October 14, 1982, he complained that he was coughing up blood. A sputum test was done, but Haavisto was not isolated and additional x-rays were not taken until October 25, 1982. The radiologist suspected tuberculosis after he read this x-ray, and Haavisto was sent to St. Paul Ramsey Medical Center and active tuberculosis was confirmed.

Further, the district court found deficiencies in the investigations that followed the discovery of active tuberculosis at Stillwater. Allain Hankey, the Director of the State Tuberculosis Control Program at the Minnesota Department of Health, was called in to direct a contact investigation to determine whether Haavisto had infected other inmates. Hankey was given complete control over the contact investigation, which she conducted based on the concentric circle method [10] set forth in guidelines promulgated by American Thoracic Society and the Center for Disease Control.[11]

Hankey chose Haavisto's classmates as the circle of his closest contacts. Although testing of the inmates in the same class revealed possible converters, Hankey determined that Haavisto was not the source of any other infections. Thus, the circle was not expanded and the investigation ended without testing the cell hall where Haavisto lived. In October of 1983, James Murray, an inmate who had lived next to Haavisto, was diagnosed with active tuberculosis. Hankey's contact investigation of this case revealed several converters and the investigation and testing were expanded to include the entire cell hall. Other active cases, some with unknown sources, were discovered during this investigation and their contacts were tested. The follow-up testing was concluded in April of 1984.

The district court found that Hankey prematurely ended the Haavisto investigation. Hankey failed to recognize that Haavisto could have been the source of some of the conversions that were discovered during the Murray investigation. Hankey also failed to conduct investigations in one of the cell halls where two converters were found, one of whom, Pedro Fernadez-Martin, apparently had active tuberculosis. The district court determined that, as of July of 1984, Stillwater acted unreasonably in not developing a protocol dealing with the control and prevention of tuberculosis.

10. Concentric circle contact investigations involve testing those people who had the closest contacts (first level contacts) with the infectious person. Mantoux tests are given and follow-up tests are given ten weeks later. If none of the contacts tested have changed from precontact negative Mantoux tests to positive tests, the investigation stops. However, if the investigation reveals that some contacts converted from negative to positive, the circle of contacts should be expanded to include more distant contacts.

11. CDC is known for its expertise in controlling infectious diseases such as tuberculosis and ATS is an association of medical professionals specializing in the treatment of diseases of the heart and lungs. The ATS/CDC guidelines on the surveillance, control and treatment of tuberculosis are considered authoritative.

Further, the lack of organization within the prison health care administration evinced a lack of care and reckless disregard for the serious medical needs of the inmates.

The tuberculosis problem at Stillwater was not yet under control. Ervin Graham was diagnosed with active tuberculosis in May of 1986. This diagnosis was made approximately two months after Graham began complaining of symptoms consistent with active tuberculosis. The district court found that the prison physician's failure to consider the possibility of tuberculosis before May indicated an inappropriately low level of tuberculosis suspicion among the health care providers at Stillwater.

Claudia Miller replaced Hankey at the department of health and she recommended that Graham's cell hall be used as his first level contacts. This testing revealed several converters. The department of health was unable to define a wider contact group, and, thus, recommended testing the entire prison. Testing of all inmates revealed thirty-two new converters. Follow-up testing was delayed because Graham had been returned to the general population while he was still infectious. Thirty-one additional converters were discovered in September of 1986 during the follow-up testing. The district court found that the failure to test all the inmates when Graham was diagnosed, instead of conducting concentric circle testing, violated the inmates' rights to be free from serious health risks.

The district court also noted several violations of a consent decree entered as a result of a previous class action lawsuit filed by inmates at Stillwater. *See Hines v. Anderson,* 439 F.Supp. 12 (D.Minn.1977). The district court held that some of the violations were evidence of the Stillwater officials' deliberate indifference to the inmates' serious medical needs. These violations included the failure to develop written infection control policies, the failure to keep adequate medical records and charts, and the failure to provide a full-time doctor and medical director.

The district court determined that Stillwater's response to the tuberculosis outbreak, taken as a whole, evidenced deliberate indifference to the serious medical needs of the inmates. Stillwater's "serious and persistent instances of negligent and substandard efforts to remedy the tuberculosis epidemic" before the middle of 1986 evidenced deliberate indifference to the inmates' serious medical needs. *DeGidio,* 704 F.Supp. at 959–60. The court, recognizing that Stillwater officials did respond, although inadequately, to the tuberculosis outbreak, distinguished cases in which prison officials completely abrogated their duties to provide even minimal medical care. *Id.* at 959. The court's holding, however, was based on a series of negligent or reckless actions taken in response to the outbreak.

Pung strenuously argues that the evidence does not support a finding of deliberate indifference. He asserts that the district court, by refusing to recognize the intent element inherent in deliberate indifference, imposed a standard greater than is required by the eighth amendment. According to Pung, *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) and *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), require a showing of "some degree of intent" to establish a deprivation of medical care in violation of the eighth amendment. Brief for Appellant at 16. Pung recognizes that a pattern of reckless or negligent conduct may support a finding of deliberate indifference, but, he contends that the conduct at issue here was not sufficiently egregious to establish that the officials at Stillwater knew or should have known that the inmates' serious medical needs were not being met.

While the immediate concern of the drafters of the eighth amendment may have been physical torture, the amendment clearly prohibits the "denial of medical care ... result[ing] in pain and suffering which no one suggests would serve any penological purpose." *Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. In *Estelle,* the Court held that punishment must be consistent with contemporary standards of decency and "conclude[d] that deliberate indifference to

serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Id.* at 104, 97 S.Ct. at 291 (citation omitted). The Court made clear, however, that the eighth amendment does not transform medical malpractice into a constitutional claim. *Id.* at 105–06, 97 S.Ct. at 291–92.

We disagree that an intentional deprivation of medical care is required to establish deliberate indifference. In *Canton,* the Court held that a city can be held liable under section 1983 for inadequately training its employees when "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton,* 489 U.S. at 388, 109 S.Ct. at 1204. Liability attaches only when the failure to train amounts to a city policy or custom. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *Id.* at 389, 109 S.Ct. at 1205.

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390, 109 S.Ct. at 1205 (footnote omitted). Under *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a city is liable under section 1983 only when its policies cause a constitutional violation. As stated above, inadequate training is considered a city policy only when the failure reflects a conscious or deliberate choice— deliberate indifference. The Supreme Court's discussion of deliberate indifference, although in the context of a municipality's liability, is helpful in determining the applicable standard in this case.

In *Berry v. City of Muskogee,* 900 F.2d 1489 (10th Cir.1990), the Tenth Circuit addressed the deliberate indifference standard in the aftermath of *Canton* and *Whitley v. Albers,* 475 U.S. 312, 320–21, 106 S.Ct. 1078, 1084–85, 89 L.Ed.2d 251 (1986) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)) (eighth amendment standard in the context of prison riot is " 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' "). The Tenth Circuit concluded that *Whitley* preserved a distinction between "the malicious and sadistic standard applicable in prison riot situations and the deliberate indifference standard applicable to more ordinary prison policy decisions," and that *Canton* required a higher degree of fault than gross negligence. *Berry,* 900 F.2d at 1495. Thus, the court rejected a standard as low as gross negligence and a standard as high as criminal recklessness. To maintain the distinction set forth in *Whitley* and to recognize the restriction in *Canton,* the court held "that an official or municipality acts with deliberate indifference if its conduct (or adopted policy) disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights." *Id.* at 1496.

Thus, those circuits that have held repeated negligent acts indicating systemic deficiencies in the method of providing medical care may amount to deliberate indifference are within the standard enunciated in *Berry.* *See Kelley v. McGinnis,* 899 F.2d 612, 616–17 (7th Cir.1990); *Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984); *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977). Although this court has not directly addressed this

issue, we have held that "prison officials may be liable where they are 'deliberately indifferent to [a prisoner's] constitutional rights, either because they actually intended to deprive him of some right, or because they acted with reckless disregard of his right to be free from violent attacks by fellow inmates.'" *Martin v. White*, 742 F.2d 469, 474 (8th Cir.1984) (quoting *Branchcomb v. Brewer*, 669 F.2d 1297, 1298 (8th Cir.1982)). In *Glick v. Henderson*, 855 F.2d 536 (8th Cir.1988), we stated that a plaintiff "could have a colorable claim under § 1983 if he could show that there is 'a pervasive risk of harm to inmates' of contracting the AIDS virus and if there is 'a failure of prison officials to reasonably respond to that risk.'" *Id.* at 539-40 (quoting *Martin*, 742 F.2d at 474).

The above-mentioned decisions support the district court's conclusion that a consistent pattern of reckless or negligent conduct is sufficient to establish deliberate indifference to serious medical needs. And, the district court held that the continuing pattern of reckless and negligent conduct of the Stillwater officials amounted to such indifference. *DeGidio*, 704 F.Supp. at 955. The court's finding that the Stillwater officials responded to the tuberculosis outbreak with a series of negligent and reckless actions is a factual finding. Further, whether these actions constituted "conduct ... disregard[ing] a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights" is a factual finding. *Berry*, 900 F.2d at 1496. *See Taylor v. Turner*, 884 F.2d 1088, 1090 (8th Cir.1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986). We review these findings for clear error and reverse only if we are left with the definite impression that a mistake has been made. As indicated, the district court's findings are amply supported by the record and we find no error. DeGidio was properly classified as a prevailing party and entitled to an award of attorneys' fees and costs.

■ DeGidio cross-appeals the district court's decision to reduce the amount of the requested fees and costs. The district

court must determine what fee is reasonable after deciding that a plaintiff qualifies as a prevailing party. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The starting point should be the number of hours reasonably expended, multiplied by a reasonable hourly rate—the lodestar. The court may reduce the award if the documentation of the hours is inadequate or if the hours were not reasonably expended. Further, the court may adjust the award based on the degree of success. *Id.* at 433-34, 103 S.Ct. at 1939-40. When unsuccessful claims cannot be clearly separated from the claim or claims on which the party prevailed, "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* at 435, 103 S.Ct. at 1940. The district court "may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment." *Id.* at 436-37, 103 S.Ct. at 1941.

■ Here, the district court began with the lodestar. The court noted that several claims were unsuccessful, and injunctive relief ultimately was denied. Thus, the court reduced the fee request by sixty-five percent to account for the limited success and to account for incomplete and deficient time records. The court also reduced the request for costs by seventy-five percent to allow compensation for expenses commensurate with the level of success and to avoid an award for expenses not properly assessed against Pung.

As noted in *Hensley*, the district court has the discretion to determine what amount of fees are appropriate when a plaintiff achieves only limited success. Here, DeGidio did reveal constitutionally inadequate conditions and the lawsuit served as a catalyst for the remedial actions taken by the officials at Stillwater. However, the constitutional violations were remedied before the trial commenced. The additional remedial actions that DeGidio sought at trial were not granted and injunctive relief was denied. The district

court acted within its discretion to reduce the amount of the award in light of the limited success of this action.

### B. *Hines* decree

■ DeGidio also sought injunctive relief in the district court under section 1983 based on violations of the *Hines* decree. The court rejected DeGidio's claims that the consent decree was directly enforceable under section 1983 and that the decree created a liberty interest which had been deprived without due process. DeGidio challenges both findings.

DeGidio cites no case in support of the proposition that a consent decree may be enforced through section 1983, and we have found none. In fact, the reasoning of the Fifth Circuit in *Green v. McKaskle*, 788 F.2d 1116 (5th Cir.1986), which held to the contrary, is persuasive. In *Green*, the court noted that contempt actions provide an adequate remedy for violations of court orders. A consent decree is negotiated by the parties and may be extremely detailed and provide relief far beyond constitutional requirements. Thus, such decrees provide exceptional relief for prisoners. Allowing a damage claim under section 1983, as well as a contempt action for enforcement, "would discourage prison officials from agreeing to such benefits." *Id.* at 1123. Further, prison officials with limited resources may not be able to implement every aspect of a wide-ranging remedial decree. They may be forced to choose, possibly after consultation with class representatives, which provisions to implement. Compliance would be deterred if individual prisoners were allowed to seek damages for violations of every detail of the decree. Accordingly, we decline to hold that a consent decree may be enforced through a section 1983 action.

DeGidio's second contention, that the consent decree created a liberty interest subject to the protection of procedural due process, requires closer review. Assuming that a liberty interest could arise from a

consent decree, the district court found that the *Hines* decree, while arguably containing language sufficiently mandatory to create protected interests, did not create any procedural standards to guide the Stillwater officials' conduct. *DeGidio*, 704 F.Supp. at 952–53. The court distinguished the provisions of the *Hines* decree from parole guidelines and inmate segregation rules which have been held to create liberty interests on the basis that the decree does not contain procedural standards that guide officials' discretion. *Id.*

■ Again, we have found no case directly supporting DeGidio's position.[12] The Supreme Court recently reiterated that "a State creates a protected liberty interest by placing substantive limitations on official discretion." *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989) (quoting *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983)). The Court stated that "the most common manner in which a State creates a liberty interest is by establishing 'substantive predicates' to govern official decisionmaking, and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Id.* (citing *Hewitt v. Helms*, 459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983)). Thus, the presence of substantive predicates guiding the prison officials' conduct is required to establish procedural due process protection. A liberty interest is created when the statute or regulation in question mandates "that if the regulations' substantive predicates are present, a particular outcome must follow." *Id.* 109 S.Ct. at 1910.

In evaluating the substantive guidelines contained in a South Dakota parole statute to determine whether a liberty interest had been created, this court held:

> Even if substantive guidelines are to be considered, however, unless these guidelines limit the parole board's discretion to release the prisoner, no liberty

---

**12.** The Supreme Court recently declined to express an opinion on the possibility that a consent decree could create an enforceable liberty

interest. *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 109 S.Ct. 1904, 1911 n. 5, 104 L.Ed.2d 506 (1989).

interest in parole is established. In other words, for a state to create a protectible liberty interest the statute or regulation must *require* release upon satisfaction of the substantive criteria listed.

*Dace v. Mickelson*, 816 F.2d 1277, 1280 (8th Cir.1987) (en banc) (citation omitted). A liberty interest is created only if an official must take specific action based upon the substantive guidelines set forth. *See id.*

Here, the substantive guidelines that DeGidio claims created a liberty interest are in the form of a consent decree entered into to remedy violations of the eighth amendment. The decree required certain improvements in the conditions of confinement at Stillwater. Some of the provisions related directly to providing medical care. However, the decree does not place substantive restrictions on the exercise of discretion by Stillwater's officials. None of the decree's provisions require that the officials do anything based upon substantive criteria. The decree does not guide the officials' discretion by mandating that should they find certain criteria to exist some appropriate response is required. The nature of the decree is remedial. It does not purport to create substantive rights. *See Green*, 788 F.2d at 1123.

## III. CONCLUSION

The judgment of the district court is affirmed.